UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 92-3591

_____


MONICA STROIK,

                                        Plaintiff-Appellee,

                        versus

WILBUR PONSETI and
WARREN G. WOODFORK,

                                        Defendants,

WILBUR PONSETI,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court for the
            Eastern District of Louisiana
_____

(September 28, 1994)


Before GARWOOD and BARKSDALE, Circuit Judges and SHAW,* District
Judge.

GARWOOD, Circuit Judge:

        Defendant-appellant Wilbur Ponseti (Ponseti) appeals the trial

court's denial of his motion for judgment as a matter of law in

this suit under 42 U.S.C. § 1983 alleging Ponseti's excessive use

of force.  Because we find that Ponseti's use of deadly force was

_____

*        Chief Judge of the Western District of Louisiana, sitting by
designation.

objectively reasonable, we conclude that the trial court erred in denying Ponseti's motion.  Accordingly, we reverse.

### Facts and Proceedings Below

On the evening of October 27, 1989, Ponseti, a police officer with the New Orleans, Louisiana, Police Department, was on patrol in a police car in the second district of the City of New Orleans with his partner, Officer Kevin Balancier (Balancier).  At or around 10:30 p.m., the officers heard a police radio broadcast concerning a series of armed robberies that had just occurred in their patrol area.  The radio message indicated that four persons were suspected of committing the robberies, that the suspects were driving a blue van, and that two of the suspects were black and two were white.  The broadcast further indicated that the suspects were armed.

Upon hearing another radio message that the van had been spotted on St. Charles Street, the officers attempted to intercept the suspects.  When they arrived at St. Charles, Ponseti and Balancier observed two police cars following a blue van at high speed.  The officers joined in pursuit.  The chase continued for several blocks until the van struck a pedestrian.  The driver then turned into oncoming traffic, proceeded up the street, and attempted a left turn, but instead lost control of the vehicle and ran into a curb.

As the van came to a stop, a black male opened the sliding, passenger-side door and fled on foot.  Balancier parked the police car in the middle of the intersection and, running past the open sliding door of the van, chased the suspect down the street.  At

2

the same time that Balancier ran past the van, Ponseti was running toward the van. As Ponseti came around the back of the van to its passenger side, he observed a second black male and a white female exiting the van through the sliding door. The black male was behind the white female with his left hand around her waist and was holding a handgun in his right hand. Ponseti immediately fired his gun seven to nine times, killing the black male and wounding the white female.[1]

The decedent was later identified as Paul Johnson. The injured female was Monica Stroik. She and her brother, Christopher Stroik, had been carjacked by the two black males and then taken as hostages by Johnson and the other man as they committed three armed robberies of pedestrians.

When Ponseti attempted to handcuff Monica Stroik, she responded that she was innocent and that she was wounded. It was only then that the officers learned that the Stroiks had been carjacked and taken as hostages by the two men.

On October 17, 1990, Monica Stroik filed suit pursuant to 42 U.S.C. § 1983 against Ponseti and Warren Woodfork, the Superintendent of the New Orleans Police Department. In accordance with 28 U.S.C. § 636(c), the parties consented to proceed before the magistrate judge assigned to the case. On May 4, 1992, the case was tried before a six-person jury. Both Ponseti and Woodfork moved for judgment as a matter of law; the court granted the motion for Woodfork but denied Ponseti's motion. On May 7, 1992, the jury

---

[1] The woman was struck once in the right side of her abdomen.

returned a verdict against Ponseti, awarding Stroik $600,000 in actual damages, and finding that Stroik was not entitled to punitive damages against Ponseti.  On May 8, 1992, the magistrate judge entered judgment on the verdict for Stroik and against Ponseti.

Ponseti then timely filed a motion for judgment as a matter of law or, in the alternative, a new trial.  Ponseti's motion was based on his assertion that his conduct was objectively reasonable under the circumstances and, thus, as a matter of law, not an excessive use of force.  The magistrate judge denied Ponseti's motion.  Ponseti now brings this appeal.

## Discussion

In an appeal from the denial of a judgment as a matter of law, our review of the district court proceedings is limited.[2]  *See Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (*en banc*). To reverse the denial of a judgment as a matter of law, "the facts and inferences [must] point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict."  *Id*.  We review the record as a whole, not just the evidence favorable to the verdict, but in the light and with all reasonable inferences most favorable to the verdict.  *Id*.  A mere scintilla of evidence does not suffice to create a fact issue, rather there must be a conflict in substantial evidence.  *Id*. at 374-75.  It is for the jury to weigh conflicting

---

[2]    Under the current Federal Rule of Civil Procedure 50, the terms "directed verdict" and "judgment notwithstanding the verdict" have been replaced by the single term "judgment as a matter of law."

4

reasonable inferences and determine the credibility of witnesses. *Id*. at 375. But a verdict may not rest on speculation and conjecture. *Nichols Const. Corp v. Cessna Aircraft Co.*, 808 F.2d 340, 346 (5th Cir. 1985). However, if reasonable persons could disagree as to the verdict, a judgment as a matter of law is inappropriate, and we must affirm. *Boeing Co*. at 374.

The issue in this appeal is whether the magistrate judge erred in concluding that there was a jury question as to whether Ponseti's shooting constituted excessive force.

A deadly force complaint under section 1983 is a federal constitutional claim, and is analyzed according to Fourth Amendment standards. *See Reese v. Anderson*, 926 F.2d 494, 500 (5th Cir. 1991). "*[A]ll* claims that law enforcement officers have used excessive forceSQdeadly or notSQin the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 109 S.Ct. 1865, 1871 (1989) (emphasis in original). In applying *Graham*, this Court has used a three-part test for section 1983 excessive force claims, requiring a plaintiff to show "(1) a significant injury,[3] which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable."

---

[3]    *But see Harper v. Harris County*, 21 F.3d 597, 600 (5th Cir. 1994) (holding that the significant injury requirement of *Johnson v. Morel*, 876 F.2d 477 (5th Cir. 1989), a case involving a Fourth Amendment violation, is no longer valid in the wake of *Hudson v. McMillian*, 112 S.Ct. 995 (1992), in which the Supreme Court held that a showing of a significant injury was not required to prove an Eighth Amendment violation).

5

*Reese*, 926 F.2d at 500 (citing *Johnson v. Morel*, 876 F.2d 477, 480 (5th Cir. 1989) (*en banc*) (*per curiam*)).  The burden of proof on each of these elements is, of course, on the plaintiff.

In the case *sub judice*, there is no dispute that Stroik suffered a significant injury which resulted from Ponseti's use of force.  Thus, the only question is whether Ponseti's use of force was "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation."  *Graham*, 109 S.Ct. at 1872 (citing *Scott v. United States*, 98 S.Ct. 1717, 1723-1724 (1978), and *Terry v. Ohio*, 88 S.Ct. 1868, 1879 (1968)).  In answering this question, we look at the totality of the circumstances, paying particular attention to "whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest."  *Id*. (citing *Tennessee v. Garner*, 105 S.Ct. 1694, 1699-1700 (1985)).

When a suspect is fleeing and an officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."  *Garner*, 105 S.Ct. at 1701.  Indeed, "if the suspect threatens the officer with a weapon . . . deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."  *Id*.  Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgmentsSQin circumstances that are tense, uncertain, and rapidly

6

evolvingSQabout the amount of force that is necessary in a particular situation." *Graham*, 109 S.Ct. at 1872.

Although "'[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,'" *id*. at 1871 (quoting *Bell v. Wolfish*, 99 S.Ct. 1861, 1884 (1979)), our application of the *Graham* standard to the facts in *Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991), is instructive as to its parameters in this Circuit. In *Reese*, we held that a police officer was entitled to summary judgment in a section 1983 action where the officer shot and killed a robbery suspect. Responding to a radio call for the robbery of a convenience store, the police officer in *Reese* spotted the suspects' car and began to give chase. During the chase, which reached speeds of forty to sixty miles per hour, the suspects threw out of the car window what appeared to be parts of a cash register. The suspects' car eventually spun out of control and the police car pulled up along the passenger's side. Kneeling behind his open car door, the police officer instructed the suspects to raise their hands. After initially complying, the suspect in the front passenger seat reached down below the seat with his left hand. The officer again commanded the suspects to raise their hands and again the suspect in the passenger seat raised and then lowered his hand. After this happened several times, the officer, fearing for his safety, shot the suspect once in the head, killing him. The officer later found that the suspect was, in fact, unarmed. *Id.* at 500.

In analyzing the district court's denial of the police officer's motion for summary judgment in *Reese*, we concluded that

"[u]nder these circumstances, a reasonable officer could well fear for his safety and that of others nearby. He could reasonably believe that [the suspect] had retrieved a gun and was about to shoot." *Id.* at 501. For this reason, we held that the "officer [was] justified in using deadly force to defend himself and others around him," *id.*, and that the officer was entitled to summary judgment as a matter of law.

In *Smith v. Freeland*, 954 F.2d 343, 347 (6th Cir. 1992), the Sixth Circuit followed our decision in *Reese* in analogous circumstances, also aptly pointing out:

> ". . . we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure."[4]

In the case *sub judice*, the essential facts are not in dispute. When Ponseti and Balancier arrived at the scene of the shooting, all of the information they possessed indicated that there were both black and white suspects in the van, that they were

---

[4]     *Smith* also observes:

"Furthermore, the fact that Officer Schulcz's actions may have violated Springdale's policies regarding police use of force does not require a different result. Under § 1983, the issue is whether Officer Schulcz violated the Constitution, not whether he should be disciplined by the local police force. A city can certainly choose to hold its officers to a higher standard than that required by the Constitution without being subjected to increased liability under § 1983." *Id.*

Again, we agree.

8

armed, and that they had all been involved in the robberies of pedestrians. The van had just come to an abrupt stop after a high speed chase during which the van had struck a pedestrian. One suspect had begun to flee on foot and two others were exiting the van. Finally, the crucial fact in this case is that at the time Ponseti came around the rear of the van, he testified, and there is no evidence contradicting this testimony, that Johnson was pointing a gun at him.[5] Hence, unlike the officer in *Reese*, Ponseti's life was actually in jeopardy when he shot. Given these facts, Ponseti had "probable cause to believe that the suspect[s] pose[d] a threat of serious physical harm," *Garner*, 105 S.Ct. at 1701, to Ponseti, or to others if the suspects were allowed to flee. Because Ponseti could have reasonably believed that the suspects posed an imminent, deadly threat, we conclude that he was justified in using deadly force.[6]

---

[5] The parties dispute whether Stroik and Johnson were standing or were on the ground as Ponseti rounded the back of the van; however, all direct evidence indicates that, whether standing or on the ground, Johnson was pointing his gun at Ponseti. There is no evidence from which a jury could conclude otherwise.

[6] Stroik contends that several factors militate against a finding that Ponseti's use of force was not excessive. Ultimately, Stroik's argument boils down to an assertion that the evidence supported a jury finding that "Ponseti was not in full control of his anger and that he impulsively abandoned his police training and shot the robbers, believing that Monica Stroik was also a robber." Appellee's Brief at 10. In support of her argument, she notes that Christopher Stroik testified that Ponseti seemed "enraged" after the shooting and that a pre-employment psychological profile indicated that Ponseti had "poor impulse control." Regardless of the merits of these claims, Stroik's argument fails because its focus is on Ponseti's subjective state of mind. In so doing, Stroik disregards the Court's instruction in *Graham* that we determine objectively the reasonableness of a police officer's use of force, "without regard to their underlying intent or motivation." *Graham*, 109

## Conclusion

We therefore conclude that the magistrate judge erred in denying Ponseti's motion for judgment as a matter of law. Accordingly, the judgment below is

REVERSED.

---

S.Ct. at 1872.