# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-CA-01004-SCT

*HINDS COUNTY, MISSISSIPPI, CITY OF
JACKSON, MISSISSIPPI, BILLY JADE (JAY)
ALBRIGHT IN HIS INDIVIDUAL CAPACITY AND
MISSISSIPPI BUREAU OF NARCOTICS*

*v.*

*RONNIE BURTON*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/14/2014 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| TRIAL COURT ATTORNEYS: | CARLOS E. MOORE |
| | TANGALA L. HOLLIS |
| | AAFRAM Y. SELLERS |
| | LARA E. GILL |
| | PIETER TEEUWISSEN |
| | MARK D. RAY |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JASON E. DARE |
| | J. LAWSON HESTER |
| | LASHUNDRA JACKSON-WINTERS |
| | MONICA JOINER |
| | LARA E. GILL |
| | THOMAS E. WHITFIELD, JR. |
| | JOHN T. KITCHENS |
| ATTORNEYS FOR APPELLEE: | TANGALA L. HOLLIS |
| | CARLOS E. MOORE |
| | DARRYL A. WILSON |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND RENDERED - 03/31/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

EN BANC.

LAMAR, JUSTICE, FOR THE COURT:

¶1.     A drug task force was attempting to execute a search warrant on a suspected drug house when gunfire broke out. Several men were standing in front of the house as the task-force convoy arrived, and, according to the officers, at least one of those men started shooting at the officers and their vehicles. One of the police officers, who was riding in the bed of a convoy pickup truck, stood and returned fire. Ronnie Burton was standing with the man or men who allegedly were shooting at the police, but he did not fire the shots. Instead, he began to run before the shooting started.

¶2.     At some point a bullet struck Burton. The bullet passed through his right shoulder and was never found. Burton did not actually see anyone shoot, and he admits that he cannot identify exactly when he was shot, where he was when he got shot, what caliber of bullet hit him, or who shot him. He conceded that it was possible that one of his armed companions at the house could have fired the shot that hit him, but Burton believes the police shot him. The police officer who returned fire testified that the one person he shot at was not Burton but a man shooting at the police vehicles. Burton did not produce any witnesses or other evidence to contradict the testimony of the officers.

¶3.     Because he was caught fleeing the scene and in possession of a weapon, Burton was arrested. He was released shortly thereafter, when it was determined that he was not the shooter. Burton sued—under the Mississippi Tort Claims Act (MTCA)—the law-enforcement entities that make up the task force as well as the officer who fired his weapon. The Hinds County Circuit Court, First Judicial District, rejected the defendants' claims of MTCA immunity, and found in favor of Burton on most of his claims, awarding him

2

$350,000 for his injuries. Because we find the defendants are immune under the MTCA, we reverse the judgment of the circuit court and render judgment in their favor.

**Facts and Procedural History**

¶4.     The Jackson Enforcement Team (JET) is a joint drug-enforcement effort led by the Mississippi Department of Public Safety Bureau of Narcotics (MBN). The team is made up of MBN agents as well as members from Hinds County Sheriff's Office (HCSO), Jackson Police Department (JPD), and Mississippi Department of Corrections (MDOC).

¶5.     On Friday, September 12, 2008, an eight-vehicle JET convey drove to a house in Jackson to execute a no-knock search warrant. The task force had obtained the warrant after purchasing several thousand dollars' worth of marijuana and prescription drugs from an individual doing business from that address.

¶6.     Burton and several other men were in the carport of the house when the JET convoy approached. According to the JET members' testimony, an individual at the house began firing shots from the carport area as the first convoy vehicle arrived. One officer, Billy Jade Albright, was in the bed of a pickup truck in the convoy. When the convoy began taking fire, he testified, he returned fire at the shooter, aiming at the one man he could identify who was shooting at the officers. Albright testified that he located the man by the muzzle flashes of the pistol the man was shooting and fired back to protect the convoy and allow the rest of the team to exit their vehicles in safety. He acknowledged that other people were near the shooter when the shots were exchanged. It is undisputed that Albright was the only JET member who fired a weapon that night.

3

¶7.     Burton testified that he ran away from the carport before the shooting started because he thought the JET convoy was actually a drive-by shooting. He did not see anyone shoot. He admitted that he and others with him that night were armed. The defendants presented ballistic evidence from the scene that indicated someone fired several shots from the carport and at least one shot hit a JET vehicle. The slug found embedded in the body of the vehicle was fired, according to the crime-lab report, from a weapon that was found near the carport. Investigators also found several spent shell casings matching the slug and the gun. They also found shell casings at the scene that were from a gun that was not recovered. Burton did not challenge any of this evidence.[1]

¶8.     At some point during the exchange, Burton was shot. The projectile went all the way through his right shoulder. The bullet was never recovered, and he admitted there was no ballistic evidence indicating that Albright's weapon fired the shot that caused the injury. Burton claims he first noticed he was shot as he was running around the side of the house, but he does not know where the shot came from or who fired it. In his deposition, about which he was questioned at trial, he admitted it was possible that one of his companions fired the shot. No other witness testified as to who shot Burton or where he was when the bullet struck him. Burton testified that after he ran around the house, he attempted to load his own gun but dropped the magazine and was unable to do so.

---

[1]On appeal, the defendants argue that Burton has failed to prove causation, pointing out that Burton offered nothing other than his speculation that it was Albright who shot him. Because we find the defendants are immune, we do not address causation.

¶9.     Some JET members found Burton hiding under a car at a nearby house and called an ambulance for him. After he was treated at University of Mississippi Medical Center (UMMC), JPD officers arrested Burton and transported him to the Raymond Detention Center. He was charged with five counts of aggravated assault on a law enforcement officer and one count of shooting into an occupied vehicle. When Burton appeared in Jackson Municipal Court two days after the shooting, these charges were remanded to the file because of a lack of evidence. The defendants do not claim that Burton was the shooter. Burton was released upon return to the Raymond Detention Center.

¶10.    Burton sued the City of Jackson, Hinds County, MBN, and Albright, claiming negligent hiring/supervision,[2] false arrest/false imprisonment, negligent/intentional infliction of emotional distress, assault, battery, and malicious prosecution.[3] The case was tried in Hinds County Circuit Court in January 2012. The trial court entered its final judgment on January 15, 2014, finding the following:

> 1. That the Defendants are jointly and severally liable for the injuries of the Plaintiff;
>
> 2. That the Defendants City of Jackson and MBN [are] vicariously liable for Defendant Officer Albright, who was acting within the scope and course of his employment;

---

[2]Burton apparently did not pursue his negligent hiring/training, or intentional-infliction-of-emotional-distress claims. He failed to include them in his proposed findings of fact and conclusions of law, and he failed to raise them after trial, even though the trial court did not address them in his opinion or judgment. Burton does not cross-appeal or otherwise argue these issues before this Court. *See* ***Bannister v. State***, 731 So. 2d 583, 588 (Miss. 1999) (holding that issues not argued on appeal are abandoned).

[3]The trial court found the defendants not liable for Burton's claim of malicious prosecution. That finding is not at issue on appeal.

3. That Defendants City of Jackson, MBN, Hinds County, and Albright are liable for negligent infliction of emotional distress;

4. That Defendant Albright is liable for civil assault and battery in his Official and Individual Capacities; [and]

5. That Defendant Hinds County is liable for false imprisonment[.]

The trial court denied the defendants' post-trial motions. All defendants appeal, raising a total of seventeen issues. Because we find the defendants are immune under the MTCA, we address only two issues:

**1. Whether MBN, the City of Jackson, and Hinds County are immune under the police-protection exemption found in Mississippi Code Section 11-46-9(1)(c).**

**2. Whether Hinds County is immune under the inmate exemption of the MTCA found in Mississippi Code Section 11-46-9(1)(m).**

### Standard of Review

¶11.    "A circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence." *City of Jackson v. Powell*, 917 So. 2d 59, 68 (Miss. 2005) (quoting *City of Jackson v. Perry*, 764 So. 2d 373, 376 (Miss. 2000) (internal quotation marks omitted)). "However, this Court reviews errors of law *de novo*, including the proper application of the Mississippi Tort Claims Act . . . ." *Id.*

**1. Albright, MBN, the City of Jackson, and Hinds County are immune under the police-protection exemption found in Mississippi Code Section 11-46-9(1)(c).**

¶12.    The trial court found Albright, the City of Jackson, and MBN liable for assault and battery, and all the defendants liable for negligent infliction of emotional distress, based on

6

a finding that Albright shot Burton as Burton was fleeing. Mississippi Code Section 11-46-9(1)(c) provides that

> (1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:
> . . .
> (c) Arising out of any act or omission of any employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury.

Miss. Code Ann. § 11-46-9(1)(c) (Rev. 2012) Thus, to recover, Burton was required to prove by a preponderance of the evidence that Albright acted with reckless disregard of Burton's safety and that Burton was not engaged in criminal activity.

### *The trial court's findings of fact were against the overwhelming weight of the evidence.*

¶13.   "A trial judge's findings of fact must be manifestly wrong and against the overwhelming weight of the evidence for an appellate court to disturb them." ***Richardson v. Norfolk S. R.R. Co.***, 923 So. 2d 1002, 1009 (Miss. 2006). "A trial court's finding of fact is found to be manifestly wrong when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made.'" ***Melchiors v. Melchiors***, 607 So. 2d 1237, 1239 (Miss. 1992) (quoting ***UHS-Qualicare v. Gulf Coast Cmty. Hosp.***, 525 So. 2d 746, 755 (Miss. 1987)). Examining the entire record, we are firmly convicted that a mistake has been made here.

¶14.    The trial court found that the defendants were not immune under the MTCA because Albright acted in reckless disregard of Burton's safety and well-being.[4] Specifically, the trial court found that "Albright was acting with reckless disregard, as he fired his weapon toward a group of individuals, at night, in a residential neighborhood, from a moving vehicle, *with no one posing an imminent threat to the officers or others present at the scene*." (Emphasis added.) We see no basis in the record for the finding that no one posed an imminent threat to the officers.

¶15.    In addition to Albright, three MBN agents and a Hinds County sheriff's deputy all testified that they either saw or heard someone shooting at the vehicles as they approached the house. Kenneth Blandford, an MBN agent who was in the first convoy vehicle, testified that he saw a man standing at the residence shooting at the vehicles as they drove up. Ronald Rhodes, another MBN agent, saw the same thing, and was actually sitting on the side of the vehicle that drew gunfire. Deputy Keith Burnett also testified that the team started taking fire as it pulled up to the house. Finally, Geoff Still, the MBN agent in charge of the operation, was sitting in the cab of the truck from which Albright fired and testified that he heard gunshots from the house before he heard the report of Albright's much-closer weapon.

---

[4]Some defendants argue that Burton was involved in criminal activity because he was carrying a concealed weapon without a permit to do so. But this Court has held that "[i]n order to prove that a victim is engaged in criminal activity "'it must be shown that the criminal activity has some causal nexus to the wrongdoing of the tortfeasor.'" ***Powell***, 917 So. 2d at 69 (quoting ***Perry***, 764 So. 2d at 739). Since no defendant has argued, and the record does not support, that there was a causal nexus between Burton having a concealed weapon and his being shot, we focus on the reckless-disregard portion of Section 11-46-9(1)(c). Furthermore, Burton does not argue that the defendants were not engaged in police-protection activities.

8

¶16.    On the other hand, Burton's was the only testimony offered to support his claims. He admitted that he was off the carport before the shooting started and only heard—never saw—anyone shoot. He admitted at least one of the other men was armed, and he admitted that it was possible one of them shot him. But he thought only the police shot. He offered no reasons for thinking this or any evidence that contradicted the officers' testimony or the physical evidence indicating someone fired shots from the carport that hit a vehicle in the police convoy. In fact, he testified twice—once in deposition and once at trial—that he had no idea what happened behind him after he ran. Since Burton presented nothing which contradicts or casts into doubt the testimony of the officers, we take it as true:

> The rule is that the testimony of a witness which is uncontradicted, and who is not impeached in some manner known to the law, where he is not contradicted by the circumstances, must be accepted as true. It is true that direct evidence of a witness may be contradicted by circumstances, but in such case the circumstances relied on for contradiction must be inconsistent with the truth of the testimony. When the testimony of a witness is not contradicted, either by direct evidence or by circumstances, it must be taken as true.

*Hearin-Miller Transp., Inc. v. Currie*, 248 So. 2d 451, 454 (Miss. 1971) (quoting *Ryals v. Douglas*, 39 So. 2d 311, 317 (Miss. 1949)). Burton presented no evidence that contradicted the officers' testimony. As such, we conclude that the trial court's finding that "no one pos[ed] an imminent threat to the officers or others present at the scene" was manifestly wrong.

### Burton failed to prove reckless disregard.

¶17.    "The plaintiff has the burden of proving 'reckless disregard' by a preponderance of the evidence." *Titus v. Williams*, 844 So. 2d 459, 468 (Miss. 2003) (citing *Simpson v. City*

9

*of Pickens*, 761 So. 2d 855, 859 (Miss. 2000)). This Court has defined reckless disregard as "a higher standard than gross negligence and 'embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act.'" *Collins v. Tallahatchie Cty.*, 876 So. 2d 284, 287 (Miss. 2004) (quoting *Turner v. City of Ruleville*, 735 So. 2d 226, 230 (Miss. 1999)). "It typically involves a conscious indifference to consequences, and almost a willingness that harm should follow." *City of Jackson v. Shavers*, 97 So. 3d 686, 688 (Miss. 2012) (citing *Maye v. Pearl River Cty.*, 758 So. 2d 391, 394 (Miss. 1999)). "Reckless disregard is found where there is a deliberate disregard of an unreasonable risk and a high probability of harm." *Id.* (citing *City of Laurel v. Williams*, 21 So. 3d 1170, 1175 (Miss. 2009)). In analyzing whether the actions of law enforcement officers amount to reckless disregard of the safety and well-being of others, "[t]his Court has held that 'the nature of the officers' actions is judged on an objective standard with all the factors that they were confronted with, taking into account the fact that the officers must make split-second decisions." *Phillips v. Miss. Dep't of Pub. Safety*, 978 So. 2d 656, 661 (Miss. 2008) (quoting *Powell*, 917 So. 2d at 71). Also, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (1989)).

¶18.    We previously have held it to be objectively reasonable for an officer to use deadly force when his life and the lives of others are in immediate danger. In *Elkins v. McKenzie*, this Court held that an officer's use of deadly force against a man who was retreating into his

10

house was objectively reasonable, because the victim was aiming a loaded weapon at the police officer and refused to lower it. *Elkins v. McKenzie,* 865 So. 2d 1065, 1088 (Miss. 2003). After the officer followed the victim into his house, the victim began firing at the police officer. *Id.* at 1069. In that case, innocent bystanders were in the house, and the officer testified that he did not know where they were when he was shooting the victim. *Id.* at 1081. Nonetheless, this Court held that the officer's use of deadly force was objectively reasonable under the circumstances. *Id.* at 1088. This Court specifically noted that the officer was receiving fire, and that the officer "believed that it was his duty to take the actions that he did when confronted with a situation that placed other officers and himself in danger." *Id.* at 1087.

¶19.    In a case more factually similar to this one, the Fifth Circuit found an officer's actions to be objectively reasonable even when the officer accidentally shot the unarmed *victim* of a carjacking rather than the actual perpetrator. *See Stroik v. Ponseti*, 35 F. 3d 155, 156 (5th Cir. 1994). There, Officer Wilbur Ponseti, along with several other police officers, was chasing some armed-robbery suspects through New Orleans. *Id.* The suspects were driving a van until the van came to a stop after hitting a curb. *Id.*

> As the van came to a stop, a black male opened the sliding, passenger-side door and fled on foot. Balancier [Ponseti's partner] parked the police car in the middle of the intersection and, running past the open sliding door of the van, chased the suspect down the street. At the same time that Balancier ran past the van, Ponseti was running toward the van. As Ponseti came around the back of the van to its passenger side, he observed a second black male and a white female exiting the van through the sliding door. The black male was behind the white female with his left hand around her waist and was holding a handgun in his right hand. Ponseti immediately fired his gun seven to nine times, killing the black male and wounding the white female.

11

*Id.* at 156. The injured woman was later identified as Monica Stroik, who had been carjacked by the decedent and his accomplices. *Id.* at 156–57. In analyzing the facts under the objectively reasonable standard, the Fifth Circuit found that "the only question is whether Ponseti's use of force was ''objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation.'" *Id.* at 158 (quoting *Graham*, 490 U.S. at 396).

¶20. The Fifth Circuit concluded that Ponseti's actions were objectively reasonable because of the threat the suspect posed, notwithstanding the fact that Ponseti also shot an innocent bystander:

> When Ponseti and Balancier arrived at the scene of the shooting, all of the information they possessed indicated that there were both black and white suspects in the van, that they were armed, and that they had all been involved in the robberies of pedestrians. The van had just come to an abrupt stop after a high speed chase during which the van had struck a pedestrian. One suspect had begun to flee on foot and two others were exiting the van. Finally, the crucial fact in this case is that at the time Ponseti came around the rear of the van, he testified, and there is no evidence contradicting this testimony, that Johnson [the decedent] was pointing a gun at him. Hence . . . Ponseti's life was actually in jeopardy when he shot. Given these facts, Ponseti had "probable cause to believe that the suspect[s] pose[d] a threat of serious physical harm,*"* [*Tennessee v.*] *Garner*, 471 U.S. [1], 11, 105 S. Ct. [1694], 1701[, 85 L. Ed. 2d 1 (1985)], to Ponseti, or to others if the suspects were allowed to flee. Because Ponseti could have reasonably believed that the suspects posed an imminent, deadly threat, we conclude that he was justified in using deadly force.

*Id.* at 159 (footnotes omitted). Here, Albright and the other JET members were in immediate danger from an assailant firing a weapon at their vehicles. Albright aimed at the shooter and fired. Thus, considering the factors with which Albright was confronted—namely someone shooting at him and his fellow officers—and taking into account the fact that he had to make

12

a split-second decision, we find that Albright's actions were objectively reasonable. We further find that Burton failed to prove that Albright acted with reckless disregard. As such, the police-protection exemption affords the defendants immunity from Burton's claims, and the trial court erred when it ruled otherwise.

### *The violation of an internal policy is not dispositive of reckless disregard*.

¶21.	The trial court found Albright acted in reckless disregard in part because it found that Albright's actions violated JPD's and MBN's internal policies governing the use of deadly force.

¶22.	While the parties dispute which use-of-force policy applied to Albright—a JPD officer on special contract to the MBN-led JET task force—the trial court did not decide this issue; it simply found that Albright had violated both policies. Neither do we make such a finding, because regardless of which use-of-force policy applied to Albright that night, and assuming a violation occurred, "the violation of a police policy is not dispositive of reckless disregard . . . ." *City of Jackson v. Lewis*, 153 So. 3d 689, 696 (Miss. 2014). In this Court's police-chase jurisprudence, it is just one of ten factors courts must consider when determining if a given pursuit constitutes reckless disregard. *Id.*

¶23.	For these reasons, the trial court erred when it determined that the defendants were not entitled to MTCA immunity under the police-protection exemption.

### 2. Hinds County is immune under the inmate exemption of the MTCA found in Mississippi Code Section 11-46-9(1)(m).

¶24.	Without addressing immunity, the trial court found that Hinds County falsely imprisoned Burton in its Raymond Detention Facility. It is undisputed that JPD officers

13

arrested Burton, and that no Hinds County employee was involved in the arrest. It also is undisputed that the false-imprisonment claims against Hinds County all stem from the time Burton was at the Raymond Detention Facility.

¶25.　Hinds County argues that Burton's false-imprisonment claims against it arose when Burton was an inmate, and therefore it is entitled to immunity under Section 11-46-9(1)(m), which provides immunity from the claims "[o]f any claimant who at the time the claim arises is an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution . . . ." Miss. Code Ann. § 11-46-9(1)(m) (Rev. 2012).While the MTCA does not define "inmate," this Court has defined the term broadly, to include pretrial detainees, such as Burton. *See, e.g.*, ***Liggans v. Coahoma Cty. Sheriff's Dep't***, 823 So. 3d 1152, 1156 (Miss. 2002).

¶26.　Burton's only argument on appeal is that his claim accrued *before* he was detained but *after* he was "accepted" by Hinds County at its Raymond Detention Center. Burton's position is essentially that his claims arose at a time when he was not an inmate but was in the process of being booked. We previously have rejected a similar argument. *See **Love v. Sunflower Cty. Sheriff's Dep't***, 860 So. 2d 797, 800 (Miss. 2003) (holding that plaintiff in the process of bonding out was an "inmate," notwithstanding plaintiff's claim that he was a "civilian detainee in the process of being released."). As it relates to false-imprisonment claims against Hinds County, we find that Burton is a "claimant who at the time the claim ar[ose] [wa]s an inmate." Miss. Code Ann. § 11-46-9(1)(m). Therefore, Hinds County is immune and the trial court erred by not dismissing those claims.

14

## Conclusion

¶27.     The City of Jackson, Hinds County, MBN, and Albright are immune under either the police-protection exemption or the inmate exemption found in the MTCA. As such, we reverse the judgment of the Circuit Court of the First Judicial District of Hinds County and render judgment in favor of the defendants.

¶28.     **REVERSED AND RENDERED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR. KING, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, J.**

**KING, JUSTICE, SPECIALLY CONCURRING:**

¶29.     While I agree with the majority that, under the specific facts of this case, Hinds County is entitled to immunity pursuant to the inmate exception, I write separately to express my concerns about adopting such a broad interpretation of the term "inmate."

¶30.     Section 11-46-9(1)(m) provides:

> (1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:
> . . . .
> (m) Of any claimant who at the time the claim arises is an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution . . . .

Miss. Code Ann. § 11-46-9(1)(m) (Rev. 2012). I believe that inherent in this exemption is the presumption that an inmate has been properly and lawfully detained.[5] The majority states that this Court has broadly defined the term "inmate" to include pretrial detainees such as

---

[5]" The tort of false arrest, in both its common law and constitutional variants, protects and vindicates the individual's interest in freedom from unwarranted interference with his personal liberty." ***Phillips v. D.C.***, 458 A.2d 722, 725 (D.C. App. 1983).

Burton. Yet, if Burton had proven that he was not lawfully arrested or detained, the label of "inmate" would surely not be applicable. To embrace such a broad definition of this term would mean that the government could arrest anyone at any time for any reason, lock him/her up, and allow hm/her to suffer abuse, injury, and misuse, for which there would be no legal redress.

¶31.    Where the detention is improper and unlawful, there should be no immunity. The definition of false imprisonment is "the confinement of the plaintiff within boundaries fixed by the defendant, *without legal justification*, by an act or the breach of a duty intended to result in such confinement." *State for Use of Powell v. Moore*, 174 So. 2d 352, 355 (Miss. 1965) (emphasis added). A person who is held without legal justification should not be thought of as an inmate, but instead as a citizen who has been wrongfully deprived of his liberty.

¶32.    Under the specific facts of this case, I agree with the majority that Burton has failed to prove his false imprisonment claim. However, I am unwilling to adopt an interpretation of the term "inmate" as used in Section 11-46-9(1)(m) that would include individuals whose detention and incarceration is improper and/or unlawful.

   **KITCHENS, J., JOINS THIS OPINION.**

16