BARNES, J., FOR THE COURT:
*789 ¶ 1. A.C.'s[1] mother and grandmother (the plaintiffs) sued the Jackson Public School District (JPS) under the Mississippi Tort Claims Act (MTCA) after A.C., a special-education student, was involved in a sexual encounter with another special-education student. The complaint alleged A.C. was sexually assaulted by the other student as a direct result of JPS's failure to provide proper care and supervision of its students. After a bench trial, the trial court ruled in favor of JPS, finding that JPS did not breach its general ministerial duty to supervise the students properly and that even if it had, there was no evidence that the breach was causally related to the sexual encounter. The plaintiffs appealed. We find no manifest error in the trial court's ruling and affirm.
FACTS
¶ 2. On October 9, 2013, sixteen-year-old A.C. was walking to class in the hallway of Callaway High School in Jackson, Mississippi, when she and a nineteen-year-old male student entered a bathroom and had sex. The sexual encounter was confirmed by a rape kit at a local hospital.
¶ 3. At the time of the incident, A.C. was a special-education student in the ninth grade at Callaway. She had Down Syndrome. Psychiatrist Dr. Mark Webb evaluated A.C. and found that she had a "severe intellectual disability." He testified that she was emotionally "very childlike" and functioned on the level of a five or six year old. He opined that, to a reasonable degree of medical probability, she was incapable of consenting to the sexual act. This finding is undisputed by JPS on appeal. The male student, T.H., was also a special-education student. Both A.C. and T.H. had individualized-education programs (IEP), which specified the education plan and care they were to receive at school. Per T.H.'s IEP, he had a history of behavioral issues, including stabbing another student in the head with a pencil, making obscene gestures with his tongue, using inappropriate language, and writing profanity on the board in the classroom. He was also known to "touch ... girls in their private areas whenever he thinks that [the teacher is] not aware."
¶ 4. On the day of the incident, A.C. and T.H. had been in homeroom together on the first floor and were dismissed to go to their next classes. The special-education assistant teacher testified that T.H. was not left alone with other students due to his past behavior. To keep him separated from the other students when homeroom was dismissed, the assistant teacher sent T.H. out of the classroom several minutes before the other students and to the left toward his ROTC class down the hall on the first floor. The assistant teacher testified that on the day in question, she followed her normal procedure of watching him walk to his ROTC class, and she believed he had entered the classroom, although she could not be sure because the classroom doorways are in inlets, and she could not see the door. After she believed he was in the classroom, the assistant teacher dismissed A.C. and the other students to the right to go to art class on the second floor. She testified that she watched them walk to the elevator and get on it, but she did not follow them.
¶ 5. Moments later, on the second floor, a security officer saw A.C. and T.H. near *790 one another. T.H. was behind A.C. and stopped to high five the security officer prior to proceeding down the hallway. The security officer did not follow them. This was captured on surveillance video. T.H. and A.C. then entered the girls' bathroom around the corner, outside the view of the surveillance camera. They were missing from class for approximately twenty minutes, during which time the incident occurred. A.C. was found exiting the bathroom and adjusting her clothes by the assistant principal, who then entered the bathroom and found T.H. hiding inside. A.C.'s mother was not notified of the incident, and A.C. was sent home on the bus as usual. A.C.'s mother later learned of the incident from A.C.'s cousin, who also attended Callaway.
¶ 6. On October 7, 2014, A.C.'s mother and grandmother filed a complaint under the MTCA against JPS in the Hinds County Circuit Court, First Judicial District.[2] The complaint alleged negligence, violation of state statutes, breach of contract, tortious breach of contract, and an argument under the theory of res ipsa loquitur. The plaintiffs alleged that JPS was under a ministerial duty to provide A.C. with an escort to and from class at school and that its failure to do so led to the sexual assault.
¶ 7. JPS raised various affirmative defenses, including immunity under the MTCA for any claims based on the performance or failure to perform a discretionary function. JPS later moved for summary judgment, and its motion was denied. A bench trial was held on August 22, 2016.
¶ 8. On October 10, 2016, the circuit court entered its final judgment in favor of JPS. The court found JPS owed A.C. a general ministerial duty but did not owe A.C. a specific ministerial duty to escort her at all times. The court further found that A.C.'s IEP did not impose upon JPS a duty to provide A.C. with an escort because the IEP contained no language requiring A.C. to be escorted. A.C.'s mother testified that she did not request an escort provision in the IEP because Callaway's former principal-whose name A.C.'s mother did not know-had orally promised her that A.C. would be escorted. The court found no duty was created by the alleged oral promise. The promise was allegedly made prior to the IEP, and the court found that to the extent the IEP was a contract, as the plaintiffs argued, prior oral promises were void unless included.
¶ 9. Because there was no specific duty to escort A.C. in the IEP or elsewhere, the court found that JPS's duty was the general ministerial duty imposed on all schools to supervise children properly. See Miss. Code Ann. § 37-9-69 (Rev. 2013). The court, as the fact finder, found that reasonable efforts had been made to supervise the students properly and keep them safe because the assistant teacher monitored the students in the hallway and reasonably believed T.H. had entered his ROTC class prior to allowing A.C. to enter the hallway. The court further found no causal relationship existed between JPS's alleged failure to supervise A.C. or T.H. and A.C.'s injuries. The plaintiffs timely appealed the trial court's ruling.
*791 STANDARD OF REVIEW
¶ 10. "The circuit court has the sole authority for determining the credibility of witnesses when it sits as the trier of fact." Miss. Dep't of Pub. Safety v. Durn , 861 So.2d 990, 994 (¶ 7) (Miss. 2003). "A circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor[,] and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence." Hinds Cty. v. Burton , 187 So.3d 1016, 1020 (¶ 11) (Miss. 2016). "A trial judge's findings of fact must be manifestly wrong and against the overwhelming weight of the evidence for an appellate court to disturb them." Id. at (¶ 13). Questions of law, including proper application of the MTCA, are reviewed de novo. Id. at (¶ 11).
ANALYSIS
I. Whether JPS breached its ministerial duty to A.C.
¶ 11. The plaintiffs argue that JPS failed in its ministerial duty to provide a safe environment and that A.C. was directly harmed as a result.
¶ 12. "The MTCA provides the exclusive civil remedy against a governmental entity for acts or omissions which give rise to a suit." Smith ex rel. Smith v. Leake Cty. Sch. Dist. , 195 So.3d 771, 774-75 (¶ 9) (Miss. 2016). "Any tort claim filed against a governmental entity or its employee shall be brought only under the MTCA," and "a school district is a governmental entity under the MTCA." Id. "Under the MTCA, sovereign immunity is waived for claims for money damages arising out of the torts of governmental entities and their employees, unless they are explicitly exempted from this waiver under Section 11-46-9(1) of the Mississippi Code." Smith , 195 So.3d at 774-75 (¶ 9). Mississippi Code Annotated section 11-46-9(1) (Rev. 2012) exempts discretionary but not ministerial duties from immunity. Smith , 195 So.3d at 774-75 (¶ 9).[3]
¶ 13. A ministerial duty is a duty that is "positively designated ... by statute, ordinance, or regulation." Id. at 776 (¶ 17). Section 37-9-69 states that "each superintendent, principal and teacher in the public schools of this state ... shall hold the pupils to strict account for disorderly conduct at school, on the way to and from school, on the playgrounds, and during recess." The Mississippi Supreme Court has found that " Section 37-9-69 of the Mississippi Code imposes upon school districts a ministerial duty to 'use ordinary care and to take reasonable steps to minimize foreseeable risks to students thereby providing a safe school environment.' " Smith , 195 So.3d at 776 (¶ 14) (quoting Moss Point Sch. Dist. v. Stennis , 132 So.3d 1047, 1050 (¶ 13) (Miss. 2014) ). "The school is not an insurer of the safety of pupils, but has the duty of exercising ordinary care, of reasonable prudence, or of acting as a reasonable person would act under similar circumstances." Summers ex rel. Dawson v. St. Andrew's Episcopal Sch. Inc. , 759 So.2d 1203, 1213 (¶ 40) (Miss. 2000).
¶ 14. Although the trial court found JPS was under the general ministerial duty *792 imposed on all schools by section 37-9-69 to supervise its students properly, the trial court found that no breach of this duty was shown. The trial court found that JPS took reasonable steps to minimize foreseeable risks and provide a safe environment by reasonably ensuring that T.H. was not left alone with other students. The assistant teacher testified that she was aware of T.H.'s behavioral issues, including that he had in the past touched girls in their private areas when he thought the teacher was not looking. For this reason, T.H. was dismissed from the classroom several minutes before the other students, and the assistant teacher would watch him exit homeroom and walk to his next class.
¶ 15. The assistant teacher testified that on the day in question, she watched him walk to his ROTC class and believed he had entered the classroom, although she could not be sure because the classroom doorways are in inlets, and she could not see the door. She saw him enter the inlet. After she believed he was in the classroom, the assistant teacher dismissed A.C. and the other students to the right to go as a group to art class on the second floor. She testified that she watched them walk to the elevator and get on it, but she did not follow them. The trial court found this procedure sufficient to satisfy the general ministerial duty to minimize foreseeable risks and provide a safe environment. The trial court further found that the general ministerial duty did not include a duty to escort special-needs students to and from class or the bathroom.
¶ 16. The plaintiffs argue that A.C.'s IEP created a ministerial duty for A.C. to be escorted at school. Because A.C. was a special-education student, she was under an annually renewed IEP that was developed by JPS and A.C.'s mother. The IEP specified the education plan and care A.C. was to receive at school. A.C.'s mother signed the IEP annually. The plaintiffs argue that the IEP was a contract, and JPS's failure to provide an escort was a breach of the contract. However, the IEP undisputedly contained no provision requiring A.C. to be escorted. The trial court noted that by law, a student's parent and the school must meet to form the IEP, and the parent must sign and agree to the IEP. See 20 U.S.C. § 1414(d) (2002) ; Miss. Code Ann. § 37-23-137 (Rev. 2013). The parent may appeal if unhappy with the IEP. 20 U.S.C. § 1415(f) (2002). A.C.'s mother had signed the IEP each year, saying she had reviewed it. A.C.'s IEP contained other written provisions A.C.'s mother was concerned about, but contained no provision about an escort. No appeal was taken of the IEP. Thus, we find no error in the trial court's finding that the IEP did not create a ministerial duty to escort A.C.
¶ 17. Next, the plaintiffs argue the Code of Ethics applicable to all licensed educators imposed on JPS a duty to protect A.C. from T.H. The Code of Ethics states that it is unethical for a licensed educator to fail to "provide appropriate supervision of students and reasonable disciplinary actions." Miss. Educator Code of Ethics & Standards of Conduct 1.2(e). It further provides that it is unethical for a licensed educator to "commit[ ] any act of ... child endangerment." Id. at 4.2(b). The Code of Ethics is not mentioned in the trial court's final judgment. It was introduced into evidence during Principal William Trammell's testimony. We find that the Code of Ethics mirrors the duties set out in section 37-9-69. Again, as interpreted by our supreme court, section 37-9-69 requires a public school to "use ordinary care and to take reasonable steps to minimize foreseeable risks to students thereby providing a safe school environment." Smith , 195 So.3d at 776 (¶ 14). There is no *793 evidence that the Code of Ethic's requirement of "appropriate supervision" meant that A.C. must be constantly escorted at school; nor is there support for the argument that a licensed educator at Callaway committed an act of child endangerment. We find that the trial court appropriately considered the standard set by the supreme court and that the Code of Ethics did not create additional ministerial duties not addressed by the trial court.
¶ 18. Finally, the plaintiffs cite A.C.'s lack of intellectual ability and T.H.'s history of behavioral issues and argue that JPS per se breached its ministerial duty because A.C. ended up alone and in a sexual encounter with T.H. No law supports the argument that the fact that a sexual encounter occurred on school property is a per se breach of duty. This issue is without merit.
II. Whether JPS took reasonable steps to minimize foreseeable risks.
¶ 19. The plaintiffs argue that JPS failed to take steps to minimize the foreseeable risk that T.H. would harm A.C.
¶ 20. The plaintiffs cite to testimony from A.C.'s art teacher that A.C. was "always" escorted to class, and when she did not arrive at art class on the day in question, the art teacher asked a student escort where A.C. was. They also cite testimony that according to A.C.'s IEP, she could only follow one-step directions and should not have been expected to find her way to her next class unescorted. They further point to the special-education assistant teacher's testimony that T.H. was never to be left alone with other students and that T.H. had a history of touching "girls in their private areas" when he thought no one was looking.
¶ 21. We cannot find the trial court erred in finding the school took reasonable steps to minimize any foreseeable risks. The only evidence that T.H. had a violent past was in his IEP, which said that T.H. stabbed another student with a pencil nine years earlier. There is no other history of violence. The record does show that T.H. had made obscene gestures with his tongue and would touch girls inappropriately if he thought the teacher was not looking. But the trial court found that JPS used ordinary care to minimize any foreseeable risk of T.H. being alone with other students by dismissing T.H. from class before the other students and watching the students walk to class to ensure T.H. was not with the other students. There was nothing in the record to indicate that T.H. had ever attempted to leave his class to harm another student.
¶ 22. As stated, the trial judge, sitting as the fact finder, was charged with weighing the testimony and judging the credibility of the witnesses. We cannot find the trial court manifestly erred in finding that JPS did what was required to minimize foreseeable risks. Further, there is no evidence that T.H.'s leaving class or his and A.C.'s entering a bathroom and engaging in a sexual encounter was foreseeable. This issue is without merit.
III. Whether JPS failed to hold T.H. to "strict account."
¶ 23. Section 37-9-69 states that "superintendents, principals and teachers shall hold the pupils to strict account for disorderly conduct at school, on the way to and from school, on the playgrounds, and during recess." (Emphasis added). The plaintiffs argue that JPS knew T.H. had a history of violence and failed to hold him to "strict account." It is undisputed that JPS was under a statutory, ministerial duty to hold its students "to strict account for disorderly conduct" while the students were in JPS's care. See id. Again, our *794 supreme court has held this to mean that schools must "use ordinary care and ... take reasonable steps to minimize foreseeable risks to students thereby providing a safe school environment." Smith , 195 So.3d at 776 (¶ 14).
¶ 24. The plaintiffs argue that T.H. was not held to strict account because he was allowed to "roam the hallways." However, T.H. was not given permission to roam the hallways. Rather, the teacher and assistant teacher made reasonable efforts to ensure T.H. went to his next class and to keep T.H. separate from other students due to his behavioral issues. On the day in question, the assistant teacher watched T.H. walk to his ROTC class, and the trial court found that the assistant teacher's belief that T.H. had entered the classroom was reasonable. A security guard saw T.H. on the second floor when T.H. was supposed to be in class on the first floor. However, the security guard testified that he did not know the students' class schedules, so he had no cause for concern. Further, as shown by the school's surveillance video, T.H. and A.C. were not alone together when seen by the security officer. Rather, A.C. was walking in front of T.H. and a third student was walking near them. T.H. and A.C. were not interacting with one another when seen by the security officer.
¶ 25. There is no evidence JPS failed to hold T.H. to strict account. JPS was required to "use ordinary care and to take reasonable steps to minimize foreseeable risks to students." Id. As the trial judge found in his role as the fact finder, T.H.'s behavioral issues were acknowledged, and JPS took reasonable steps to keep him separate from other students to minimize foreseeable risks. The trial judge's findings are supported by substantial, credible, and reasonable evidence. This issue is without merit.
IV. Whether the school's alleged oral promise that A.C. would be escorted at school created a ministerial duty to provide an escort.
¶ 26. The plaintiffs argue that in 2012, prior to A.C. starting school at Callaway, Callaway's principal promised them a person had been hired to escort special-needs students. The plaintiffs argue this promise was an oral contract that created a ministerial duty to escort A.C. A.C.'s mother testified: "I talked to the principal.... [W]hen I called the school and asked them, they said that the special needs kids are escorted by an adult." She stated that she also met with a man in person who she believed to be the principal, and he made the same assurance. A.C.'s mother did not know the name of the person she spoke with on the phone or met in person. A.C.'s grandmother also testified that she called the school and spoke with a man who identified himself as the principal. She testified that she volunteered to escort A.C. at school, but was told that an adult had been hired to escort special-needs students. She likewise did not know the name of the person who told her this information. The former principal was not called as a witnesses at trial. Trammell became principal at Callaway in 2013.
¶ 27. Even assuming this oral promise was made, the IEP, to the extent it is a contract as argued by the plaintiffs, voided the prior oral promise. See Hayne v. The Doctors Co. , 145 So.3d 1175, 1183 (¶ 20) (Miss. 2014) ("A written contract cannot be varied by prior oral agreements. Moreover, as an evidentiary matter, parol evidence to vary the terms of a written contract is inadmissible."). Extrinsic evidence may be considered if a provision in a contract is ambiguous. Linde Health Care Staffing Inc. v. Claiborne Cty. Hosp. , 198 So.3d 318, 325 (¶ 28) (Miss. 2016). However, there was no allegation that the IEP
*795 was ambiguous. Rather, the plaintiffs sought to add a term to the IEP that did not exist.
¶ 28. Notwithstanding, A.C.'s mother's and grandmother's testimony that an escort would be provided was contradicted by Callaway's principal at the time of the incident, as well as A.C.'s teacher and assistant teacher. Trammell, Callaway's principal at the time of the incident, testified that there was no general requirement that special-needs students receive escorts; rather, this responsibility would have to be contained in the student's IEP. The special-education teacher and assistant teacher both testified that special-education students were escorted to their classrooms at the beginning of the school year to ensure they knew where to go, and then for a short period after that, they would be "shadowed" to make sure they could find their way. After the initial orientation period, the students were sent to their next class as a group. This procedure was again followed after long school breaks, such as Christmas break, to ensure the students remembered their routes.
¶ 29. Since a written contract cannot be varied by a prior oral agreement, the alleged oral promise that A.C. would be provided with an escort is of no effect. Further, even if the oral promise were not void, it was the trial judge's role as the fact finder to weigh the testimony and witness credibility. The testimony regarding JPS's policy to provide escorts to special-needs students was conflicting. The judge weighed the evidence in favor of JPS. We cannot find manifest error in the judge's findings.
¶ 30. As stated, the trial judge in a bench trial has the "sole authority" for weighing the testimony and determining witness credibility. Durn , 861 So.2d at 994 (¶ 7). We give deference to his findings and will not reverse when those findings are supported by substantial, credible, and reasonable evidence. Burton , 187 So.3d at 1020 (¶ 11). The trial judge's findings will only be reversed if manifestly wrong and against the overwhelming weight of the evidence. Id. at (¶ 13). The trial judge weighed the evidence in his role as the fact finder, and we cannot say that his findings are manifestly wrong or unsupported by the record. Therefore, we affirm the trial court's ruling in favor of JPS.
¶ 31. AFFIRMED.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., CARLTON, FAIR, WILSON, GREENLEE AND TINDELL, JJ., CONCUR. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION.

Initials are substituted to protect the privacy of the parties involved.

The complaint also named as defendants the JPS Board of Trustees, Callaway High School, the Mississippi Department of Education, and Callaway's principal and several teachers, individually and in their capacities as JPS employees. Prior to trial, the trial court granted summary judgment in favor of the Mississippi Department of Education, and the individually named defendants were granted qualified immunity. Thus, we only address the issues raised against JPS, as it is the sole appellee in this appeal.

While not at issue here, we recognize that the Mississippi Supreme Court recently overruled Brantley v. City of Horn Lake , 152 So.3d 1106 (Miss. 2014). Wilcher v. Lincoln Cty. Bd. of Supervisors , 243 So.3d 177, 182 (¶ 13) (Miss. 2018). In Brantley , the supreme court abandoned the two-part, public-policy function test for determining whether a governmental action was ministerial or discretionary in nature. Id. The decision in Wilcher overruled Brantley and its line of cases, and it reinstated the two-part, public-policy function test. Id. at 185 (¶ 23).