# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00175-COA

SHANNON SANDERS                                                      APPELLANT

v.

ATTALA COUNTY, MISSISSIPPI                                           APPELLEE

DATE OF JUDGMENT:              01/15/2020
TRIAL JUDGE:                   HON. GEORGE M. MITCHELL JR.
COURT FROM WHICH APPEALED:     ATTALA COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        ADAM HOLT JOHNSON
ATTORNEYS FOR APPELLEE:        DANIEL JUDSON GRIFFITH
                               BETHANY ANN TARPLEY
NATURE OF THE CASE:            CIVIL - STATE BOARDS AND AGENCIES
DISPOSITION:                   REVERSED AND REMANDED - 06/22/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### EN BANC.

### CARLTON, P.J., FOR THE COURT:

¶1.     In March 2017, two Attala County Sheriff's Department deputies were called to a domestic dispute involving an intoxicated guest (Shannon Sanders) and the property owner. The property owner did not want Sanders arrested but asked the deputies to remove her immediately. The deputies did so. Because the deputies arrived in separate vehicles, they put Sanders in the backseat of Deputy Edward Fleming's patrol car and buckled her seatbelt. The deputies separately drove their vehicles to the end of the driveway (with Sanders in Fleming's patrol car) to wait for Sanders's brother to pick her up. When Sanders's brother got lost on the way to the residence, the deputies decided to give Sanders a courtesy ride to meet her brother at the intersection of Highway 19 and Highway 25. On the way to the

meeting place, first Deputy Scott Walters (who was leading the way), then Deputy Fleming, hit pooled water on the road and hydroplaned. Deputy Fleming was unable to regain control of his car, and both Sanders and Deputy Fleming were injured when his patrol car went off an embankment and hit a tree.

¶2.     Sanders filed a complaint pursuant to the Mississippi Tort Claims Act, Miss. Code Ann. §§ 11-46-1 to -23 (Rev. 2012) (MTCA), against Attala County and other entities that were later dismissed, seeking damages for the injuries she incurred in the one-vehicle accident. Attala County moved for summary judgment based upon three immunity theories: law enforcement immunity pursuant to Miss. Code Ann. § 11-46-9(1)(c) (Supp. 2016); discretionary immunity pursuant to Miss. Code Ann. § 11-46-9(1)(d); and "weather immunity" pursuant to Miss. Code Ann. § 11-46-9(1)(q). Sanders responded to Attala County's motion, asserting that Attala County was not entitled to immunity because Deputy Fleming's driving at the time of the accident showed a reckless disregard of her safety and well-being. Sanders attached an affidavit of Robert C. Willis in support of her assertions. Attala County filed a motion to strike the affidavit of Robert Willis.

¶3.     The Attala County Circuit Court granted summary judgment in Attala County's favor, finding that Sanders had failed to establish a genuine issue of material fact that there was "reckless disregard on behalf of [Deputy Fleming] as to the Plaintiff, Shannon Sanders[.]" Sanders appeals. For the reasons addressed below, we find that Sanders presented sufficient evidence to survive summary judgment. We therefore reverse and remand the case for

2

further proceedings consistent with this opinion.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

¶4. Around midnight on March 12, 2017, two Attala County Sheriff's Department deputies Scott Walters and Edward Fleming were called to a residence due to an argument between Shannon Sanders and her fiancé's brother, the homeowner. Sanders was intoxicated. Deputy Walters was the lead deputy that evening. Deputy Walters was deposed, and his deposition is included in the record. He said that the homeowner told him that Sanders "had become violent and had struck him and he wanted her to leave his property." Deputy Walters explained that the homeowner told him "that he did not want [Sanders] to go jail, but he wanted her off his property, . . . [so Deputy Walters] made the decision . . . to do what [they] call a courtesy ride." In order to alleviate the situation, he wanted to remove Sanders from the home as quickly as possible, but he intended to take her only from the house to the road (Highway 19) and wait with her until her brother picked her up.

¶5. The deputies had arrived in separate vehicles that evening, and because Deputy Walters was driving a K9 patrol truck, he decided that it would be safer to put Sanders in the backseat of Deputy Fleming's patrol car rather than in the front seat of the truck. After Deputy Walters placed Sanders in Deputy Fleming's car, her seatbelt was fastened.[1] Deputy Walters and Deputy Fleming with Sanders in the backseat drove their respective vehicles to

---

[1] Deputy Walters said that Sanders put the seatbelt on herself; Deputy Fleming said that both he and Deputy Walters "belted her in." At any rate, there is no evidence that Sanders was not fastened into the seatbelt when she was put in Deputy Fleming's patrol car.

3

the end of the driveway and waited for Sanders's brother to arrive. After waiting for some time, Sanders called her brother, and they determined that Sanders's brother had gotten lost; so Deputy Walters decided that they would take Sanders to meet her brother at the intersection of Highway 19 and Highway 25.

¶6. Both deputies proceeded onto Highway 19. Deputy Walters led the way, and Deputy Fleming, with Sanders in the backseat, followed him. Deputy Walters testified that he was always the lead car and that Deputy Fleming and Sanders were always "approximately a half a mile, three-quarters of a mile behind" him. Both deputies testified that it was raining heavily, off and on, that night.

¶7. Deputy Walters and then Deputy Fleming hydroplaned at a curve on Highway 19. Deputy Walters said that "we hit a heavy spot of rain on Highway 19, approximately two to three miles from the county line. And when I was going up the hill, . . . I guess the water was running down the hill so bad, I hit the puddle in my truck." Continuing, he said, "I did not lose control of it[.] . . . I let go of the steering wheel, let off the gas, and immediately grabbed the steering wheel back." Deputy Walters said that as soon as he had his truck under control, "I looked at my speedometer, . . . and my speed was approximately 61 miles an hour. . . . I picked the radio up, and I said, watch out for that water puddle there, it is pretty bad. And he said 10 - 4." Later in his deposition, Deputy Walters reiterated that the rain was "[h]eavy. Yes, sir. Very heavy [at the time he hydroplaned]."

¶8. When questioned about what he believed Deputy Fleming's speed may have been

4

during transport, Deputy Walters said that he was always going approximately sixty-one miles per hour when he was leading the way to meet Sanders's brother and that he could see Deputy Fleming's lights in his rearview mirror. He said that Deputy Fleming never got closer to him, so he knew "[Fleming] was not doing no more than [he] was, probably less on the speed."

¶9. Deputy Fleming was also deposed. He testified that he was a certified law enforcement officer. At the time of the accident, Deputy Fleming worked two weekends a month for Attala County because his primary occupation was driving eighteen-wheeler trucks. He said that he was pretty familiar with the stretch of Highway 19 where the accident occurred; he traveled this stretch frequently before the accident. Deputy Fleming said that this section of Highway 19 was "kind of in bad shape. It kind of holds water."

¶10. Deputy Fleming also said that on the night of the accident, he had been straddling the yellow line at some places on Highway 19 to avoid pooling water, but because the part of Highway 19 where he hydroplaned had a slight curve and slope to it, he was not straddling the yellow line as he approached the curve. He also said in his deposition that "[i]f it is raining real hard, [he] is going to drive 45 [miles per hour]."

¶11. Regarding the circumstances surrounding the accident, Deputy Fleming said that he had just enough time to pick up the radio and acknowledge Deputy Walters's message about the water puddle when he too hit the water and hydroplaned. He said that it had been raining "real good, off and on," but at the time he hydroplaned it was a "slow rain." *Id.* He said that

5

when he hit the puddle he veered into the oncoming lane, veered again, and then left the pavement, went down an embankment, and crashed into trees. His airbag deployed. Deputy Fleming said that "the airbag knocked [him] out"' but not for long. He said that when he gained consciousness he asked Sanders if she was ok, and she did not respond. He then got out of the vehicle, checked on Sanders again, and then radioed for backup.

¶12. Regarding his speed at the time of the accident, Deputy Fleming said that he did not "remember hitting [the] brakes at all," and he believed he was driving between fifty-five and sixty miles per hour, although "[g]oing down the hill [I] might have been 65. But it wasn't constant."

¶13. Sanders was deposed and was asked about what happened that evening. She said that she remembered "being in back of a cop car," looking at her cellphone; then she heard the car going on the rumble strip, and the car began to slide. She said she "blacked out from there" and that she did not "remember anything else . . . [until] waking up in the ER." When asked, "Do you have any idea how fast the deputy was driving [when the accident occurred]," Sanders responded, "No, ma'am."

¶14. Deputy Walters said that when he heard Deputy Fleming say on the radio that he had a wreck, he immediately turned around and was first on the scene. He said that Deputy Fleming was "very disoriented" when he spoke with him on the scene and that he had a chunk of his hair missing. Deputy Walters said that after being helped out of the vehicle, Sanders walked up the embankment and into an ambulance; he did not notice any visible

6

injuries on Sanders at the time. He reported hearing her say to the paramedics, "If I had not been drinking or popping pills, I would not have survived."

¶15. Trooper Jeffrey Watson was also deposed. He was on the accident scene for the Mississippi Highway Patrol, and he prepared and submitted an accident report. Trooper Watson was asked about his accident report in his deposition. He said that he was not an accident reconstructionist but that his report was "reviewed by an accident reconstructionist and approved." He said that he took photographs and talked to Deputy Fleming, Sanders, and Deputy Walters at the scene. He also went back to the scene the next day and took more photographs. Trooper Watson reported that the conditions at the scene were "dark," "unlit," "wet," and "rain." He said that the speed limit at the location of the accident was fifty-five miles per hour, and he reported that the "estimated speed" at the time of the accident was sixty-five miles per hour. Trooper Watson said that he got this information from Deputy Fleming. At another point in his deposition, Trooper Watson said that when he talked to Deputy Fleming he seemed like he was in shock.

¶16. Sanders was removed from the scene in an ambulance. Deputy Fleming was taken to the hospital in a patrol car. Both were treated for their injuries. According to her complaint, Sanders incurred injuries to her head, face, and jaw in the accident.

¶17. Following the accident, Sanders furnished a formal notice of her claim against Attala County under the MTCA pursuant to Mississippi Code Annotated section 11-46-11 (Rev. 2012). Her notice provided that her claim was to recover for the injuries she incurred

7

allegedly due to "the recklessness of [Deputy] Fleming" when he lost control of his patrol car while transporting Sanders to meet her brother. After her claim was denied, Sanders filed her complaint pursuant to the MTCA against Attala County, Mississippi, the Attala County Sheriff's Office, and the Attala County Board of Supervisors, seeking damages for her injuries she incurred in the one-vehicle accident. The Attala County Sheriff's Department and the Attala County Board of Supervisors were later dismissed with prejudice by an agreed order. Among other allegations, Sanders alleged Deputy Fleming's "actions and/or omissions demonstrating reckless disregard for [her] safety" are imputed to Attala County, and it is liable to her for her resulting injuries and damages.

¶18. On April 13, 2018, Attala County moved to dismiss Sanders's complaint based upon several immunity theories under the MTCA. The Attala County Circuit Court entered an agreed order allowing limited discovery on the immunity issues. Attala County filed its answer on November 9, 2018, and the parties completed written discovery and the fact-witness depositions of Deputy Walters, Deputy Fleming, Sanders, and Trooper Watson.

¶19. At the close of this limited discovery, Attala County moved for summary judgment on April 30, 2019, claiming that it was immune from suit based upon law enforcement immunity, Miss. Code Ann. § 11-46-9(1)(c), because the deputies had not acted in reckless disregard of Sanders's safety. Attala County also asserted that it was immune from suit under the theories of discretionary immunity pursuant to section 11-46-9(1)(d) and "weather immunity" pursuant to section 11-46-9(1)(q).

¶20. Sanders responded to Attala County's motion, asserting that Deputy Fleming's driving at the time of the accident showed a reckless disregard for her safety and well-being. In support of her assertions, Sanders attached to her response the affidavit of her previously undisclosed expert Robert C. Willis (the Willis Affidavit) in which he opined that Deputy Fleming acted "with wanton and reckless disregard for [Sanders's] safety and the safety of other motorists on the roadway" on the night of the accident. To avoid repetition, the contents of the Willis Affidavit are discussed in further detail below.

¶21. Attala County filed a motion to strike the Willis Affidavit, asserting that the expert's affidavit should be stricken because it was untimely and incomplete. Attala County further asserted that Willis's opinions were irrelevant and failed to create a genuine issue of material fact of whether Deputy Fleming acted in reckless disregard for Sanders's safety because the circuit court is "capable[,] on its own accord and perception[,]" of making this determination based upon its own review of the record.

¶22. The circuit court conducted a hearing on Attala County's summary judgment motion and also heard argument from both parties on Attala County's motion to strike the Willis Affidavit. On January 15, 2020, the circuit court issued an order setting forth its analysis and granting summary judgment in Attala County's favor.[2] On that same date, the circuit court

---

[2] Although the order was captioned "Order on Motion to Dismiss and for Omnibus Relief," the circuit court recognized in that order that the parties and the court were proceeding under Rule 56 of the Mississippi Rules of Civil Procedure (governing summary judgment).

entered a separate "Summary Judgment" in Attala County's favor and dismissed Sanders's complaint with prejudice.

¶23. The circuit court's order provided that "[a]fter having heard argument of counsel for both sides, the Court then proceeded to review the available information as to the factual scenarios involving the [accident]." This information included "the deposition testimony of Shannon Sanders; [Deputy] Edward Fleming; Deputy Scott Walters; and Jeffrey Watson, (Trooper MHP). This Court further evaluated and reviewed an Affidavit which was filed by the Plaintiff giving information presented by her expert witness [(the Willis Affidavit).]" Additionally, the circuit court reviewed Trooper Watson's accident report, photos of the accident, the written discovery responses, "statements connected with the . . . accident, along with legal authorities and case law presented."

¶24. After outlining the above-referenced deposition testimonies and reports in its order, the circuit court examined the Willis Affidavit and ultimately determined that "[n]one of [the [opinions contained in Robert Willis's affidavit] were of the scientific nature but were only based upon [Willis's] opinion and the examination of the documentary evidence which this Court also has in its possession for review. All this witness presented was his opinion with no supporting authority." We discuss the circuit court's determination regarding the Willis Affidavit in further detail below.

¶25. In its order, the circuit court then proceeded to analyze the law-enforcement immunity exemption under section 11-46-9(1)(c) and noted the definition of discretionary function

10

immunity pursuant to section 11-46-9(1)(d). The circuit court concluded:

> For reasons stated herein above, this Court finds that no genuine issue of material fact exists, and that since this action was brought under the Mississippi Tort Claims Act that the said holding herein would be directed in favor of . . . [Attala County]. This Court finds that no genuine issue of material fact exists, and [Attala County is] entitled to a Judgment in its favor . . . as a matter of law. This Court finds that there was no reckless disregard on behalf of the involved Deputy Sheriff as to the Plaintiff, Shannon Sanders.

¶26. Sanders appeals.

## STANDARD OF REVIEW

¶27. "This Court applies a de novo standard of review to a grant of summary judgment and to issues involving the interpretation and application of the MTCA." *Irwin-Giles v. Panola County*, 253 So. 3d 922, 925 (¶10) (Miss. Ct. App. 2018) (quoting *Lane v. Miss. Dep't of Transp.*, 220 So. 3d 254, 256 (¶4) (Miss. Ct. App. 2017)). As set forth in Mississippi Rule of Civil Procedure 56(c), summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "'The evidence must be viewed in the light most favorable to the party against whom the motion has been made[,]'" and "[t]he moving party has the burden of demonstrating that no genuine issue of material facts exists, [giving] . . . the non-moving party . . . the benefit of the doubt concerning the existence of a material fact." *Duckworth v. Warren*, 10 So. 3d 433, 436-37 (¶9) (Miss. 2009) (quoting *One S. Inc. v. Hollowell*, 963 So. 2d 1156, 1160 (¶6) (Miss. 2007)). Nevertheless, "[t]he mere existence

11

of some alleged factual dispute between the parties . . . will not defeat an otherwise properly supported motion for summary judgment; '[t]he dispute must be genuine, and the facts must be material.'" *Smith v. City of Southaven*, 308 So. 3d 456, 461 (¶16) (Miss. Ct. App. 2020) (quoting *Williams v. Bennett*, 921 So. 2d 1269, 1272 (¶10) (Miss. 2006)).

## DISCUSSION

### I. *Law Enforcement Immunity Under the MTCA*

¶28. Sanders asserts that the circuit court erred when it granted summary judgment in Attala County's favor based upon its determination that Sanders failed to create a genuine issue of material fact regarding whether Deputy Fleming acted in reckless disregard for her safety. As we have noted above, "[i]n reviewing the circuit court's ruling granting summary judgment in favor of the county, we must consider the evidence in the light most favorable to [Sanders], . . . [giving her] 'the benefit of all reasonable favorable inferences that may be drawn from the record.'" *Irwin-Giles*, 253 So. 3d at 927 (¶17) (quoting *Burkhalter & Co. v. Wissner*, 602 So. 2d 835, 838 (Miss. 1992)). Applying this standard, we find that Sanders has established a genuine issue of material fact as to whether Deputy Fleming acted in "reckless disregard" of her safety, and therefore we reverse the circuit court's ruling granting summary judgment in Attala County's favor based upon law enforcement immunity under section 11-46-9(1)(c).

¶29. Pursuant to section 11-46-9(1)(c) of the Mississippi Tort Claims Act:

(1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:

12

. . . [a]rising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury[.]

¶30.　Sanders was not engaged in "criminal activity" at the time of the accident; Deputy Walters testified that Sanders was not placed under arrest when the deputies removed her from the property owner's home. As such, the issue with respect to whether law enforcement immunity applies in this case is whether Attala County, namely Deputy Fleming, was acting in "reckless disregard" of Sanders's safety when his vehicle hydroplaned and left the road, resulting in the one-car accident.

¶31.　The Mississippi Supreme Court has held that "to be 'reckless' for purposes of Section 11-46-9(1)(c), the conduct must be 'willful or wanton,' not merely negligent." *City of Clinton v. Tornes*, 252 So. 3d 34, 38 (¶13) (Miss. 2018) (quoting *Maye v. Pearl River County*, 758 So. 2d 391, 393-94 (¶16) (Miss. 1999)). In particular, "'[r]eckless disregard occurs when the conduct involved evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved." *Id.* (quoting *City of Laurel v. Williams*, 21 So. 3d 1170, 1175 (¶17) (Miss. 2009)). "[R]eckless disregard usually is accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow." *Rayner v. Pennington*, 25 So. 3d 305, 309 (¶11) (Miss. 2010) (quoting *Miss. Dep't of Pub. Safety v. Durn*, 861 So. 2d 990,

995 (¶10) (Miss. 2003)). "In addition, 'the nature of the [officer's] actions is judged on an objective standard with all the factors that [he was] confronted with." *Williams*, 21 So. 3d at 1175 (¶17) (quoting *Phillips v. Miss. Dep't of Pub. Safety*, 978 So. 2d 656, 661 (¶19) (Miss. 2008)).

¶32.   Sanders asserts that she has raised a genuine issue of material fact that Deputy Fleming acted with reckless disregard for her safety because the facts, when viewed in a light most favorable to her, *see Duckworth*, 10 So. 3d at 436-37 (¶9), show that at the time of the accident Deputy Fleming was "speeding on a known dangerous, unlit, rural road during a rainy night." She asserts this case is analogous to the facts in *Maye*, *Irwin-Giles*, and *Durn*.

¶33.   In *Maye*, 758 So. 2d at 395 (¶21), the supreme court compared "reckless disregard" to negligence, holding that reckless disregard "is a failure or refusal to exercise any care, while negligence is a failure to exercise due care." It found that a deputy sheriff acted with "reckless disregard" when he blindly backed his patrol car out of a parking spot, up an incline, and into the plaintiff's car as she was entering the parking lot. *Id.* at (¶¶ 21-24).

¶34.   The supreme court found that evidence presented at trial showed that "[w]hen [the deputy sheriff] backed out of the parking space and up the incline, he did not know what was behind him. He knew he could not see cars coming into the lot and he knew checking his mirrors would not let him see cars pulling into the lot." *Id.* at (¶22). Also relevant is that the supreme court found that "[i]t is obvious from the damage to [the plaintiff's] car and the [passenger's] injuries . . . that [the deputy sheriff] was going much too fast to be backing up

14

the entrance to the parking lot when he could not see what was behind him." *Id.*

¶35. Relying on the supreme court's definition of "reckless disregard" as stated in *Maye*, this Court reversed summary judgment in favor of Panola County in *Irwin-Giles*, finding that the deputy sheriff's conduct in that case was "sufficient for the fact-finder to conclude that [he] 'fail[ed] or refus[ed] to exercise *any* care,' which our Supreme Court has characterized as reckless disregard." *Irwin-Giles*, 253 So. 3d at 927 (¶17) (quoting *Maye*, 758 So. 2d at 395 (¶21)) (emphasis by the *Irwin-Giles* court). Although the deputy sheriff said that before crossing Highway 6 he stopped at a stop sign and again at the median of the four-lane divided highway, the plaintiff's expert presented evidence that based on the "black box" information from the deputy sheriff's vehicle, the deputy sheriff did not stop at the median prior to entering the westbound lane of Highway 6, directly into the path of the Irwins' vehicle. *Id.*

¶36. Additionally, the Court recognized that "although [the deputy sheriff] testified that he looked both ways for oncoming traffic when he stopped, he acknowledged that there were no obstructions to his vision." *Id.* As such, the Court found that "[t]he fact that [the deputy sheriff's] view was not obstructed permits a reasonable inference that [he] did not look for traffic before he crossed Highway 6." *Id.* This Court concluded:

> Thus, the fact-finder could conclude from the evidence in the record that [the deputy sheriff] drove across a four-lane divided highway without stopping at a stop sign, or even slowing down, and without checking for oncoming traffic. This would be sufficient for the fact-finder to conclude that Smith "fail[ed] or refus[ed] to exercise *any* care," which our Supreme Court has characterized as reckless disregard. *Maye*, 758 So.2d at 395 (¶21) (emphasis added).

*Id.*

15

¶37. In *Durn*, 861 So. 2d at 993 (¶¶2-3), a state trooper in pursuit of a speeding vehicle attempted to pass Durn, who turned left just as the state trooper was overtaking him, and the vehicles collided. The supreme court found that "reckless disregard" existed "when the 'conduct involved evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved.'" *Id.* at 995 (¶13) (quoting *Maldonado v. Kelly*, 768 So. 2d 906, 911 (¶11) (Miss. 2000)). Utilizing this standard, the supreme court found no error in the trial court's determination that based on the evidence, the officer acted in reckless disregard—he "appreciated the unreasonable risk associated with attempting to overtake a vehicle that indicated it was turning, yet still acted in deliberate disregard of that risk." *Id.* at 996 (¶18).

¶38. Attala County asserts that the facts in this case are not comparable to *Maye*, *Irwin-Giles*, or *Durn* because unlike the officers in those cases, Deputy Fleming did not knowingly ignore an obvious safety hazard on the night of the accident. According to Attala County, knowing that water *could* pool on Highway 19 following or during a rainstorm is not the same as knowing the danger of blindly backing down a parking ramp, *Maye*, 758 So. 2d at 395 (¶22); crossing a four-lane divided highway without stopping and looking for traffic, *Irwin-Giles*, 253 So. 3d at 927 (¶17); or overtaking a vehicle on the left when the driver is signaling a left turn. *Durn*, 861 So. 2d at 996 (¶18).

¶39. Attala County also argues that to the extent Sanders asserts Deputy Fleming knew the pooling water was ahead of him due to Deputy Walters's warning, there is no evidence

16

demonstrating Deputy Fleming had enough time to react to Deputy Walters's warning about the puddle, even if he were a half-mile to three-quarters of a mile behind Deputy Walters. Deputy Fleming said that he had just enough time to pick up the radio and acknowledge Deputy Walters's message about the water puddle before he also hit the water and hydroplaned. Sanders, the only other person in Fleming's vehicle, had no recollection what had happened at this point.

¶40. Regarding Deputy Fleming's speed, Attala County asserts that even if Deputy Fleming had been traveling at sixty-five miles per hour at the time of the accident, this does not create a genuine issue of material fact about whether he was acting in reckless disregard of Sanders's safety. According to Attala County, "it is ridiculous" for Sanders to make such an argument when Deputy Walters was able to navigate the pooling water while he was traveling at sixty-one miles per hour, just four miles per hour slower than Deputy Fleming.

¶41. Based upon our de novo review of the evidence, and bearing in mind that we are bound to view the evidence "in the light most favorable to the [nonmovant]," *Duckworth*, 10 So. 3d at 436-37 (¶9), we find that Sanders has raised a genuine issue of material fact of whether Attala County is entitled to law enforcement immunity under the circumstances of this case.

¶42. Deputy Fleming testified that he traveled Highway 19 frequently and knew it very well because of his job as a tractor-trailer driver for a logging company; he said he knew that water would pool on Highway 19 when it rained. Trooper Watson reported that the

17

conditions on the night of the accident were "unlit," "dark," "wet," and "rain." Deputy Fleming said that a reasonably safe speed for operating a vehicle in heavy rain was forty-five miles per hour, and although Deputy Fleming said it was just a "light rain" at the time he hydroplaned, he also testified that as they were driving before the accident, he and Deputy Walters were "holler[ing]" on the radio and that it was "raining real good." Additionally, Deputy Walters, who was about a half-mile to three-quarters of a mile ahead of Deputy Fleming, said that he hit "a heavy spot of rain" when he hydroplaned in the same area, and he later repeated this in his deposition, stating that there was "heavy rain" at the time.

¶43. Regarding Deputy Fleming's speed, the speed limit on Highway 19 where the accident happened is fifty-five miles per hour. According to Trooper Watson's report, Deputy Fleming was operating his patrol car at sixty-five miles per hour at the time of the accident;[3] and even Deputy Fleming testified that he would say he was going "fifty-five and maybe sometimes sixty. Going down the hill might have been sixty-five."

¶44. The record also shows that Deputy Walters warned Deputy Fleming about the water pooling and that after receiving the warning, Deputy Fleming had a half-mile to three-quarters of a mile distance before he began to hydroplane. Even after receiving Deputy

---

[3] Trooper Watson said he got that information from Deputy Fleming on the night of the accident. Trooper Watson also said that Deputy Fleming appeared to be in shock at the time. Additionally, Deputy Fleming said in his deposition that for most of the time that evening he was traveling at "about 50, 55, 60, maybe sometimes 65 because, you know, going downhill. I really wasn't paying no attention. I know I was running 55, 60 most of the time that evening."

Walters's warning, Deputy Fleming testified that he did not remember slowing down before encountering the pooling water or applying his brakes at all.[4] These circumstances, viewed as a whole and viewed in the light most favorable to Sanders, demonstrate that a genuine issue of material fact existed as to whether Deputy Fleming "failed to exercise any care" before the accident.[5] *See Maye*, 758 So. 2d at 395 (¶¶21-24); *Irwin-Giles*, 253 So. 3d at 927 (¶17).

¶45.    We also find that the circumstances in *Durn* are analogous to those in this case. Deputy Fleming in this case "appreciated the unreasonable risk involved" that night because he knew that the stretch of Highway 19 that he was traveling was rural and that the road turned "bad" when it rained; it had been raining heavily that night; and Deputy Fleming

---

[4] Deputy Fleming also testified that in the past he would avoid pooling water on Highway 19 by straddling the middle dividing lines with his vehicle. He said, however, that he was not straddling the lanes on Highway 19 before he hydroplaned because there was a double-yellow line and a curve in the road at the time.

[5] Relying on *Morton v. City of Shelby*, 984 So. 2d 323 (Miss. Ct. App. 2007), the dissent asserts that even assuming Deputy Fleming was driving sixty-five miles per hour that evening, "driving 10 mph above the speed limit may be negligent in some circumstances, [but] it does not rise to the level of reckless disregard." We recognize that in *Morton*, this Court found that "[t]he mere act of speeding, with no indication as to how far in excess of the speed limit he was traveling, falls far short of demonstrating willful or wanton conduct on [the officer's] part." *Id.* at 332 (¶22). In *Morton*, however, the Court was only addressing an allegedly excessive-speed issue. *Id.* In contrast, the case before us involves a number of additional relevant factors, including, for example, the rainy conditions that night; Deputy Fleming's prior knowledge that pooling would occur on Highway 19 during heavy rain; and Deputy Fleming's testimony that even after receiving Deputy Walters's warning about the pooling water ahead, he does not recall slowing down. As we detail above, we find that these circumstances as a whole, viewed in a light most favorable to the plaintiff, raise a genuine issue of material fact about whether Deputy Fleming acted with reckless disregard in this case.

19

testified that when it was raining "real hard" he would drive forty-five miles per hour. Deputy Fleming also received a warning from Deputy Walters about the pooling water ahead of him when he was a half-mile to three-quarters of a mile behind Deputy Walters. We also find that there is a genuine issue of material fact that Deputy Fleming deliberately disregarded the risk involved and the "high probability of harm" to Sanders when he exceeded the speed limit that night and failed to slow or brake even after receiving Deputy Walters's warning.

¶46. Based upon our de novo review of the record, we hold that there exists a genuine issue of material fact whether Deputy Fleming acted in reckless disregard of Sanders's safety and well-being in this case. We therefore reverse the circuit court's determination on this issue. We now turn to address the two additional immunity theories that Attala County has raised in this case.

## II. *Discretionary Function Immunity Under the MTCA*

¶47. Attala County asserts that it is entitled to discretionary immunity under section 11-46-9(1)(d) because Deputy Walters and Deputy Fleming's decision to give Sanders a courtesy ride on the evening of the accident was a discretionary decision that involved social, economic, or political policy concerns. We find that Attala County has misapplied the two-part policy function test in making these assertions. We further find that Attala County is not entitled to discretionary function immunity for the reasons addressed below.

¶48. Discretionary function immunity under the MTCA is set forth in section 11-46-9(1)(d)

as follows:

> A governmental entity and its employees acting within the course and scope
> of their employment or duties shall not be liable for any claim . . .
>
> > [b]ased upon the exercise or performance or the failure to
> > exercise or perform a discretionary function or duty on the part
> > of a governmental entity or employee thereof, whether or not the
> > discretion be abused[.]

¶49.    As articulated by the supreme court, in order "[t]o determine if actions are covered by

discretionary-function immunity, we apply the public-policy function test resurrected in

*Wilcher* [*v. Lincoln Cnty. Bd. of Supervisors & City of Brookhaven*,] 243 So. 3d [177, 187

(¶30) (Miss. 2018)]."  *Smith v. Miss. Transp. Comm'n*, 292 So. 3d 231, 233-34 (¶8) (Miss.

2020).  In applying this two-part test, the Court "first must ascertain whether the activity in

question involved an element of choice or judgment."  *Wilcher*, 243 So. 3d at 187 (¶30)

(quoting *Miss. Transp. Comm'n v. Montgomery*, 80 So. 3d 789, 795 (¶20) (Miss. 2012)

(negative history omitted)).  "If so, this Court also must decide whether that choice or

judgment involved social, economic, or political-policy considerations.  Only when both

parts of the test are met does a government defendant enjoy discretionary-function

immunity."  *Id.*  Particularly relevant to our discussion in this case, the supreme court also

recognized that "[t]his test, of course, presupposes the court has correctly identified 'the

activity in question'—the allegedly tortious act giving rise to the claim."  *Id.*

¶50.    In *Wilcher*, the plaintiff sued the Lincoln County Board of Supervisors (County) and

the City of Brookhaven (City) under the MTCA for injuries he incurred while driving at night

when he drove into a large hole in the road. *Wilcher*, 243 So. 3d at 181 (¶5). County and City employees had "left an unfinished culvert installation overnight, without warning drivers they had removed but not yet replaced a bridge[.]" *Id.* at 180 (¶3).

¶51.    The supreme court rejected the City and County's assertion that they were entitled to discretionary-function immunity because "the placement of traffic-control devices is a discretionary function." *Id.* at 187 (¶31). The supreme court explained:

> [W]hat the parties . . . miss is that the placement or lack of placement of a traffic-control device *is not the government function being challenged. . . .*
>
> Here, the allegedly tortious act was the construction crew's alleged failure to barricade or warn against the significant drop-off in the road—a condition it created. . . . [A]pplying the public-policy function test, it certainly was not the result of a policy decision. Rather, if indeed there was such a failure, it was the result of straight-up negligence.

*Id.* at 187-88 (¶¶31-32) (emphasis added).

¶52.    Based upon this analysis, the supreme court held that "[the plaintiff] has alleged a simple act of negligence, and not a real policy decision, caused his injury. Therefore, the County and City cannot take refuge in discretionary-function immunity." *Id.* at 188 (¶35) (internal quotation marks omitted).

¶53.    The Mississippi Supreme Court recently reached a similar conclusion *Williams v. City of Batesville*, 313 So. 3d 479 (Miss. 2021), a case in which the plaintiff (Williams) sued the City for its alleged failure to maintain its sewerage system, resulting in sewage backing up into Williams's home. *Id.* at 481 (¶2). The circuit court granted summary judgment in the City's favor, finding that it was immune from liability under the MTCA. *Id.* at 482 (¶6).

22

¶54. The supreme court reversed and remanded, beginning its discretionary-function immunity analysis by recognizing that "[b]efore employing the [two-part *Wilcher*] test, the Court must "correctly identif[y] 'the activity in question'—the allegedly tortious act giving rise to the claim." *Id.* at 483 (¶14). In *Williams*, the "activity in question" was the City's maintenance of its sewerage system, and the supreme court agreed with the City that this activity constituted a discretionary function under the first prong of *Wilcher*'s two-part test. *Id.* at 484 (¶19).

¶55. Continuing, the supreme court recognized that "[t]he question is [then] whether sewer maintenance or failure, which we have identified as a discretionary function, involves real, policy-based decisions that would provide the City immunity or whether the City was simply negligent." *Id.* at (¶23). In this regard, the supreme court found that Williams had alleged negligence on the part of the City in maintaining the sewerage system, and therefore it held, "Based on our de novo review of the record, we find that a genuine issue remains as to whether the City exercised ordinary care in doing so. We reverse and remand for Williams to have the opportunity to present her negligence case against the City to the trier of fact." *Id.* at 485 (¶28); *see also Smith*, 292 So. 3d 235 (¶13) (finding that plaintiff's allegations that a Mississippi Transportation Commission employee failed to properly perform his job "[did] not fall under the umbrella of public-policy protection provided in discretionary-function immunity."); *Reverie Boutique LLC v. City of Waynesboro*, 282 So. 3d 1273, 1280 (¶¶38-39) (Miss. Ct. App. 2019) (finding that although a city's decision to build a sewer is

23

discretionary, the MTCA does not bar negligence claims for sewer maintenance); *Bailey v. City of Pearl*, 282 So. 3d 669, 678 (¶21) (Miss. Ct. App. 2019) (finding that although the decision to create a park is a discretionary function, the alleged failure to secure or maintain a gate in that park would not afford the City discretionary-function immunity.).

¶56.    The same analysis applies here.  Attala County asserts that the "activity in question" is the deputies' decision to give Sanders a courtesy ride.  But what Attala County overlooks is that in this case the "allegedly tortious act giving rise to [Sanders's] claim," *Wilcher*, 243 So. 3d at 188 (¶32), is not the decision to give Sanders a ride, but it is instead Deputy Fleming's alleged reckless conduct in driving over the speed limit around a curve in the road under the rainy, dark conditions existing at the time of the accident.  Sanders alleges that these actions, not a policy decision on the part of the State, caused her injuries.  Accordingly, we find that Attala County "cannot take refuge in discretionary function immunity."  *Id.* at (¶35).

### III.    *Weather Immunity Under the MTCA*

¶57.    Attala County also asserts that it is entitled to "weather immunity" under section 11-46-9(1)(q) because Sanders['s] injuries . . . were caused solely by the effect of weather on Highway 19."  Section 11-46-9(1)(q) provides that a governmental employee acting within the scope and duty of his or her employment duties is immune from claims "arising out of an injury caused solely by the effect of weather conditions on the use of streets and highways."

¶58. Sanders asserts that section 11-46-9(1)(q) does not apply in this case because "[w]eather was simply not the sole cause of [Sanders's] injur[ies] as required by the statute." Sanders asserts that this case also "involves the [allegedly] reckless actions of Deputy Fleming in speeding under the then and there existing circumstances despite his knowledge, both actual and constructive, of dangerous road conditions."

¶59. In support of its weather immunity argument, Attala County relies on a number of cases in which this Court affirmed summary judgment in favor of the governmental entity based on section 11-46-9(1)(q). In these cases, the Court determined that the weather was the sole cause of the plaintiff's injuries and not any act of the government employees.

¶60. In *Hayes v. Greene County*, 932 So. 2d 831 (Miss. Ct. App. 2005), for example, the plaintiff (Hayes) was traveling on a highway in Greene County; visibility was extremely low due to a heavy morning fog. *Id.* at 832 (¶6). A Greene County garbage truck was stopped on the highway. *Id.* Despite the extreme fog, Hayes said she was able to stop in time to avoid hitting the garbage truck because she could see that "the hazard lights on the garbage truck were flashing." *Id.* A second driver, however, rear-ended Hayes's vehicle without stopping, and Hayes's neck was broken in the collision. *Id.* at 832 (¶2). According to the second driver, she never saw the first car or the garbage truck because of the dense fog. *Id.* at 833 (¶7). The circuit court "found that the weather was the *sole* proximate cause of this collision, and that under section11-46-9(1)(q), Greene County was exempt from liability." *Id.* at 832 (¶5) (emphasis added). On de novo review, this Court affirmed. *Id.* at 833 (¶8).

25

¶61.     Similarly, in *Smith v. Pike County*, 312 So. 3d 731 (Miss. Ct. App. 2021), the plaintiff was injured when she drove into a washout in the road.  *Id.* at 733 (¶2).  "The washout was a result of a 'significant rain event' that occurred on the evening of March 10 and early morning of March 11."  *Id.*  The Court found that "[t]here is simply no proof that anything other than the weather was the sole cause of the accident."  *Id.* at 735 (¶17).  Accordingly, the Court held that "[b]ecause Smith fails to create a genuine issue of material fact as to whether the County was in any way responsible for the formation of the washout, we find that summary judgment was proper."  *Id.*; *see also Ostrowski v. City of D'Iberville*, 269 So. 3d 418, 421 (¶12) (Miss. Ct. App. 2018) (affirming summary judgment in favor of the city where both the plaintiff and the city "agreed that [a] manhole cover was displaced by rising water," and the plaintiff "failed to create a genuine issue of material fact . . . that the manhole cover was not displaced *solely* by the effect of the rain" (emphasis added)).

¶62.     Attala County also relies on *Lee v. Miss. Dep't of Transp.*, 37 So. 3d 73 (Miss. Ct. App. 2009), *overruled on other grounds by Little v. Miss. Dep't of Transp.*, 129 So. 3d 132 (Miss. 2013), to support its weather immunity argument.  In *Lee*, a heavy downpour caused water to pool on Mississippi Highway 63.  *Id.* at 75 (¶2).  Dorothy Sipp was driving north on Highway 63, hydroplaned, crossed the center line, and struck a southbound vehicle driven by Beverly Blankinchip.  *Id.*  Blankinchip was killed, and the passengers in her car were injured.  *Id.*  Blankinchip's estate and the passengers or their representatives sued the Mississippi Department of Transportation (MDOT) for its alleged failure to properly inspect

26

and maintain Highway 63 where the accident happened. *Id.* at (¶3). Thus, unlike the instant case, the accident in *Lee* did not directly involve a governmental employee.

¶63. The circuit court granted summary judgment in MDOT's favor based upon several theories of immunity under the MTCA, including weather immunity under section 11-46-9(1)(q). *Id.* at 75-76 (¶¶3-4). This Court affirmed. *Id.* at 81 (¶24). In addressing MDOT's immunity under section 11-46-9(1)(q), the Court began by observing it was "undisputed [that] . . . the pooling of water on Highway 63 in combination with Sipp's speed caused Sipp's car to hydroplane and collide with [the Blankinchip] vehicle." *Id.* at 80 (¶20).

¶64. Sipp, of course, was not an MDOT employee,[6] and thus *as to MDOT's liability*, the Court found that "the rutting of the highway may have heightened the risk of hydroplaning, but nonetheless, it was an open and obvious condition caused solely by the effect of weather. . . . Accordingly, we find that the circuit court did not err in determining that weather was the sole cause of the accident." *Id.* Continuing, the Court stated that in order to overcome this statutory immunity granted to MDOT, the appellants had the burden to

---

[6] Because Sipp's liability was not at issue in *Lee*, the court stated that it would "not address whether Sipp's belief that driving fifty to fifty-five miles per hour [under the rainy conditions prior to or during the accident] . . . was reasonable." *Id.* at 79 (¶15). We find relevant to the instant case, however, that the court nevertheless then made this observation: "However, it is certain that '[t]he operator of a motor vehicle has a duty to keep the vehicle under proper control and to drive at a speed *which is reasonable under the conditions that she faces*.'" *Id.* (quoting *Miss. Dep't. of Transp. v. Trosclair*, 851 So. 2d 408, 418 (¶35) (Miss. Ct. App. 2003) (citing *Upchurch ex. rel. Upchurch v. Rotenberry*, 761 So. 2d 199, 205 (¶24) (Miss. 2000))) (emphasis added by the *Lee* court).

27

show "the dangerous condition was not caused solely by the effect of weather." *Id.* at 81 (¶24). Because the appellants "failed to provide any evidence that would create a genuine issue of material fact [on this issue]," *id.*, the court found that "the circuit court did not err in granting MDOT's motion for summary judgment." *Id.*

¶65. We find that the cases discussed above are distinguishable from the circumstances in the case before us. Based upon our review of the record, we find that Sanders's alleged injuries were not "caused *solely* by the effect of weather conditions" on the night of the accident, as required by section 11-46-9(1)(q). (Emphasis added). The record reflects that Deputy Fleming knew that pooling water could occur during heavy rain on this stretch of Highway 19, yet that night he was driving over the speed limit in a curve following or during a "heavy rain." Because we find that Deputy Fleming's actions contributed to the one-vehicle accident resulting in Sanders's injuries, and thus the weather conditions were not the "sole" cause of her injuries, Attala County is not entitled to summary judgment based upon section 11-46-9(1)(q).

### IV. *The Willis Affidavit*

¶66. Attala County asserts that if this Court determines that it is not entitled to summary judgment based upon any of the theories of immunity discussed above, then this Court should "affirm the circuit court's decision" that

> Robert C. Willis set forth numerous opinions about what transpired in regards to the motor vehicle accident and what happened. None of these were of the scientific nature but were only based on his opinion and the examination of documentary evidence which this Court also has in its possession for review.

28

All this witness presented was his opinion with no supporting authority. According to Attala County, this language from the circuit court's opinion makes it "clear that the circuit court struck Mr. Willis'[s] expert opinion, or at the very least, his expert affidavit," and because Sanders did not raise any issue on appeal with respect to this "ruling," she has waived it.

¶67. In response, Sanders asserts that "[a] court speaks through its orders," *see Ill. Cent. R.R. Co. v. Moore*, 994 So. 2d 723, 729 (¶14) (Miss. 2008), and that although the circuit court judge in this case "reviewed and disregarded . . . Willis's affidavit in reaching his decision, nowhere in the Opinion does the [circuit] court strike either . . . Willis as an expert or his affidavit." Sanders acknowledges that the circuit court "found that no genuine issue of material fact existed and that Deputy Fleming did not act in reckless disregard as to Plaintiff[;]" but, according to Sanders, the circuit court made "no finding . . . as it relates to . . . Willis or his opinions, and certainly there is no language in the Opinion to indicate the court was striking him as an expert or his affidavit. Thus, it was not an issue to be appealed or to be addressed by this court."

¶68. We agree with Sanders. In addressing this issue, we examine the record, including the Willis Affidavit, the motion-hearing transcript, and the circuit court's summary judgment order in which it also addressed Willis's credentials and opinions.

¶69. According to Willis's affidavit, he was educated and trained in Wisconsin and currently lives there and teaches law enforcement classes at a technical college in Green Bay,

Wisconsin. He has "over thirty-five years of experience in the field of law enforcement and related training." Willis also lists in his affidavit the pleadings, exhibits, and depositions that he relied upon in forming the following opinions relating to Deputy Fleming's actions. In paragraph 16 of his Affidavit, Willis opines:

> [Deputy Fleming's actions] exceeded simple traffic violations and simple negligence and the totality of circumstances and factors coupled with the possible failure to secure Sanders in a seatbelt, failure to "monitor" her during transport, . . . [Deputy] Fleming's failure to conform to traffic laws and department policy, [Deputy] Fleming's failure to consider or respond to the warning by [Deputy] Walters just prior to the accident, his failure to heed that warning and to slow down, . . . his failure to consider this particular highway was not only wet and slippery but also a secondary rural road, unlit and prone to puddling, and less maintained than primary roadways, his failure to adhere to his training and the multiple traffic violations that then occurred, evidenced [Deputy] Fleming's driving with reckless disregard for the safety of Sanders and resulted in the injury of Sanders.

¶70. As addressed above, Attala County filed a motion to strike the Willis Affidavit, and the circuit court conducted a hearing in which it heard argument from both parties on Attala County's summary judgment motion and on its motion to strike the Willis Affidavit.

¶71. In its order, the circuit court first examined Willis's credentials, finding that although Willis "did have on paper an academic type background," there was no indication in Willis's affidavit that he had any experience in accident reconstruction. The circuit court further found that "it would appear that this expert had only available to him the basic same information that this Court has had for review in dealing with this Motion for Summary Judgment. The Court evaluates such in determining his acceptance as an expert witness."

¶72. The circuit court then addressed Willis's opinions. The circuit court noted some

30

factual discrepancies in Willis's support for one of his opinions and then stated:

> In paragraph 16 of the Affidavit[,] Robert C. Willis set[s] forth numerous opinions about what transpired in regards to the motor vehicle accident and what happened. None of these [opinions] were of the scientific nature but were only based upon [Willis's] opinion and the examination of the documentary evidence which this Court also has in its possession for review. All this witness presented was his opinion with no supporting authority.

¶73. We find no merit in Attala County's assertion that the circuit court struck the Willis Affidavit or Willis's opinions and that Sanders "waived" her ability to challenge the purported ruling. We find no "waiver" on Sanders's part because we find no such ruling was made in this case.

¶74. Although Attala County moved to strike the Willis Affidavit, it obtained no order that explicitly either granted or denied that motion. "[I]t is the movant's responsibility to obtain a ruling once a motion has been made, and failure to do so constitutes a waiver of that motion." *Johnson v. Cumberland*, 91 So. 3d 646, 650 (¶13) (Miss. Ct. App. 2012). And based upon our review of the Willis Affidavit, the hearing transcript, and the circuit court's summary judgment order, we find that although this order discusses the Willis Affidavit, it is not sufficiently clear to put Sanders on notice that the circuit court had excluded Willis as an expert witness in Sanders's case or that it had struck the opinions set forth in the Willis Affidavit. Willis's numerous opinions were not specifically addressed by the circuit court, and nowhere in its order did the circuit court mention Mississippi Rule of Evidence 702,

31

governing the admissibility of expert evidence, or discuss the *Daubert*[7]/*McLemore*[8] standard applicable in determining the relevancy and reliability of expert opinions. This issue is without merit.

¶75. For the reasons addressed above, we reverse the circuit court's order granting summary judgment in favor of Attala County, and we remand this case for further proceedings consistent with this opinion.

¶76. **REVERSED AND REMANDED.**

**BARNES, C.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY SMITH, J.**

**WILSON, P.J., DISSENTING:**

¶77. Under the Mississippi Tort Claims Act (MTCA), a governmental entity is not liable for any claim arising out of the acts of a law enforcement officer engaged in the performance of "police . . . protection" activities unless the officer "acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury." Miss. Code Ann. § 11-46-9(1)(c) (Rev. 2019). In this case, the circuit court properly granted summary judgment in favor of Attala County because the evidence supports, at most, a finding that Deputy Edward Fleming was negligent and does not support a finding that he acted with "reckless disregard." Accordingly, I would affirm the judgment of the circuit

---

[7] *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993).

[8] *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31 (Miss. 2003).

32

court, and I respectfully dissent.[9]

¶78.   "Reckless disregard is a higher standard than gross negligence and embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act." *City of Vicksburg v. Williams*, 294 So. 3d 599, 601-02 (¶15) (Miss. 2020) (brackets and quotation marks omitted).  An officer is not guilty of reckless disregard unless his conduct "evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved." *Id.* at 601 (¶15) (quoting *Miss. Dep't of Pub. Safety v. Durn*, 861 So. 2d 990, 994 (¶13) (Miss. 2003)). Reckless disregard "typically involves a conscious indifference to consequences, and almost a willingness that harm should follow." *Hinds County v. Burton*, 187 So. 3d 1016, 1022 (¶17) (Miss. 2016) (quoting *City of Jackson v. Shavers*, 97 So. 3d 686, 688 (¶8) (Miss. 2012)).

¶79.   Our Supreme Court has observed that "the term 'reckless disregard' has a similar definition to culpable-negligence manslaughter." *City of Jackson v. Harris*, 44 So. 3d 927, 934 (¶26) (Miss. 2010).  It is also equivalent to the degree of culpability necessary to support an award of punitive damages.  Miss. Code Ann. § 11-1-65(1)(a) (Rev. 2019).  "Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the

---

[9] Because I would affirm the judgment based on the county's police-protection immunity, I do not address other immunities raised by the county.

safety of others, or committed actual fraud." *Id.* That standard can be met "only . . . in the most egregious cases" involving "highly unusual" facts and "extreme" conduct by the defendant. *Bradfield v. Schwartz*, 936 So. 2d 931, 937 (¶18) (Miss. 2006) (quoting *Wise v. Valley Bank*, 861 So. 2d 1029, 1034-35 (¶15) (Miss. 2003)).

¶80.    In the early morning hours of March 12, 2017, Deputy Scott Walters and Deputy Edward Fleming responded to a call reporting a disturbance at an Attala County residence. Walters was in a K-9 patrol truck, while Fleming was in a patrol car. The homeowner told them that a guest, Shannon Sanders, "had become violent and had struck him and he wanted her to leave his property." Sanders was visibly intoxicated, and her ride (her fiancé) was passed out on the couch. To avoid having to arrest Sanders for trespassing, the deputies had Sanders call her brother to come pick her up, put Sanders in the back of Fleming's patrol car, and drove to the end of the driveway to wait for Sanders's brother. After waiting at least twenty minutes, Walters learned that Sanders's brother had driven in the wrong direction and was nowhere near their location. Walters then decided that he and Fleming would give Sanders a "courtesy ride" to meet her brother at the intersection of Highway 19 and Highway 25. Walters proceeded east on Highway 19 in his truck, and Fleming followed with Sanders in the back of his patrol car. There was heavy rain at the time. Viewed in the light most favorable to Sanders, the evidence would permit a finding that Deputy Fleming was driving his patrol car 65 mph—10 mph above the posted speed limit on Highway 19—when his car

hit a large puddle of water and hydroplaned off the road.[10]

¶81. While driving 10 mph above the speed limit may be negligent in some circumstances, it does not rise to the level of reckless disregard. In *Morton v. City of Shelby*, 984 So. 2d 323 (Miss. Ct. App. 2007), the plaintiff (Morton) was jogging on the side of a road when he was struck by a police car. *Id*. at 327 (¶2). The officer driving the car (Carmicle) was in the process of attempting to pass a school bus and another police car when he struck Morton. *Id.* at (¶¶3-4). The two police cars were providing an escort to the school bus, which was transporting students from a sporting event. *Id.* at (¶4). Morton alleged that while attempting to pass the school bus and the other police car, "Officer Carmicle was traveling at an excessive rate of speed in a non-emergency situation and, therefore, that there was a genuine issue of fact regarding whether Officer Carmicle acted with reckless disregard." *Id.* at 332 (¶21). This Court rejected that argument, stating that

> even if this Court were to accept Morton's argument that Carmicle was speeding at the time of the accident, . . . there is absolutely no evidence that the officer was traveling so far in excess of the speed limit to rise to the level of reckless disregard. While the fact that Officer Carmicle was speeding might indicate negligence, it is the much higher standard of reckless disregard that Morton must demonstrate. The mere act of speeding, with no indication as to how far in excess of the speed limit he was traveling, falls far short of demonstrating willful or wanton conduct on the part of Officer Carmicle.

*Id.* at (¶22) (footnote omitted).

¶82. The same is true in this case. "While the fact that [Fleming] was speeding might

---

[10] There was also evidence that Fleming was traveling at a slower speed and was not exceeding the speed limit.

indicate negligence, it is the much higher standard of reckless disregard that [Sanders] must demonstrate." *Id.* Fleming's "mere act of speeding"—exceeding the speed limit by, at most, 10 mph—"falls far short of demonstrating willful or wanton conduct on [Fleming's] part." *Id.* That is, there is no evidence that Fleming recognized and "deliberate[ly] disregard[ed]" an "unreasonable risk" and a "high probability of harm." *Williams*, 294 So. 3d at 601 (¶15) (quoting *Durn*, 861 So. 2d at 994 (¶13)). By exceeding the speed limit, Fleming did not demonstrate a near "willingness that harm should follow." *Burton*, 187 So. 3d at 1022 (¶17) (quoting *Shavers*, 97 So. 3d at 688 (¶8)). In this regard, it is important to note that Fleming was traveling in the same car as Sanders and thus was subject to the same risks as Sanders. Therefore, in order to find that Fleming acted with "reckless disregard," one would have to believe that he deliberately subjected *himself* to an unreasonable risk and a high probability of harm—that he almost willed harm to *himself*. Because there is no evidence to support such a finding, the circuit court properly granted summary judgment in favor of Attala County.[11] I respectfully dissent.

**SMITH, J., JOINS THIS OPINION.**

---

[11] As noted above, the standard for "reckless disregard" under the MTCA is substantially similar to the standard for submitting the issue of punitive damages to a jury in an ordinary civil case. *See* Miss. Code Ann. § 11-1-65(1)(a). By holding that the mere act of speeding in rainy conditions is sufficient to permit a finding of "reckless disregard," the majority opinion essentially holds that the issue of punitive damages should be submitted to the jury in any ordinary car wreck case involving rain and speeding. This improperly lowers the "much higher standard of reckless disregard," *Morton*, 984 So. 2d at 332 (¶22), to little more than ordinary negligence.